1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE EASTERN DISTRICT OF TEXAS

 3                     MARSHALL DIVISION

 4  MARK T. EDDINGSTON,     )(

 5  ET AL.                  )(   CIVIL DOCKET NO.

 6                          )(   2:12-CV-422-JRG-RSP

 7  VS.                     )(   MARSHALL, TEXAS

 8                          )(

 9  UBS FINANCIAL           )(   FEBRUARY 4, 2013

10  SERVICES, INC.          )(   1:30 P.M.

11

12

13  BILL HENDRICKS, ET AL.  )(

14                          )(   CIVIL DOCKET NO.

15                          )(   2:12-CV-606-JRG-RSP

16  VS.                     )(   MARSHALL, TEXAS

17                          )(

18  UBS FINANCIAL           )(   FEBRUARY 4, 2013

19  SERVICES, INC.          )(   1:30 P.M.

20

21                     MOTION HEARING

22        BEFORE THE HONORABLE JUDGE ROY S. PAYNE

23            UNITED STATES MAGISTRATE JUDGE

24

25
```

2

```
 1   APPEARANCES:

 2

 3   FOR THE PLAINTIFFS:  (See attached sign-in sheet.)

 4

 5   FOR THE DEFENDANT:   (See attached sign-in sheet.)

 6

 7   COURT REPORTER:      MS. SHELLY HOLMES, CSR
                          Deputy Official Court Reporter
 8                        2593 Myrtle Road
                          Diana, Texas 75640
 9                        (903) 663-5082

10

11   (Proceedings recorded by mechanical stenography,
     transcript produced on a CAT system.)
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
1                        I N D E X

2

3    February 4, 2013

4                                            Page

5        Appearances                         1

6        Hearing                             4

7        Court Reporter's Certificate        93

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1               LAW CLERK:  All rise.

2               THE COURT:  Good afternoon.  Please be

3    seated.

4               For the record, we're here for the hearing

5    on the motion to compel arbitration and the scheduling

6    conference in the -- two cases of Eddingston versus UBS

7    and Hendricks versus UBS, which are 2:12-422 and

8    2:12-606, respectively.

9               Would counsel state their appearances for

10   the record?

11              MR. BAXTER:  Good afternoon, Your Honor.

12   Sam Baxter with McKool Smith for the Plaintiff.  And

13   with me today I have Mr. Goodman from Kilgore & Kilgore,

14   Mr. Stris from California, Mr. Bro from California, and

15   Mr. Anderson from Dallas at Kilgore & Kilgore, Your

16   Honor, and we're ready.

17              THE COURT:  All right.  Thank you,

18   Mr. Baxter.

19              MR. PHILLIPS:  Your Honor, good afternoon.

20   Larry Phillips from the Siebman Burg Phillips & Smith

21   law firm today, and I have with us from the Morgan

22   Lewis firm -- I've got Deborah Davidson here and Samuel

23   Shaul -- Shaulson here with me, and they're going to be

24   speaking today on our behalf.

25              THE COURT:  All right.  Thank you very much,

1   Mr. Phillips.

2                   MR. PHILLIPS:  Thank you.

3                   THE COURT:  I want to take up the motion to

4   compel arbitration first, and I -- and I guess I would

5   like to hear from the movant -- whoever wants to speak

6   for UBS at this point.  Mr. Shaulson.

7                   MR. SHAULSON:  Yes, good afternoon.  Is this

8   good for the microphone?

9                   THE COURT:  Yes, that would be great.

10  And let -- let me -- I've got some questions that I'd

11  like you to focus your argument, and I'll give the

12  Plaintiffs a chance to respond to, but I -- I have

13  spent some time going through the briefs on this.  And

14  the way I see it, some of the argument -- at least a lot

15  of the argument from the Defendants has been about

16  whether or not the FAA overrides NASD, FINRA, that sort

17  of thing.

18                  I -- the way I understand the Plaintiff's

19  argument is that the -- the PartnerPlus or UBS pension

20  plan, I don't know, what -- what is your preferred way

21  to refer to that document?

22                  MR. SHAULSON:  It's the PartnerPlus Plan.

23                  THE COURT:  I'll call it the PartnerPlus

24  Plan, then.

25                  They contend the PartnerPlus Plan

1    arbitration clause adopts the arbitration rules of NASD

2    and FINRA, depending on the time period involved.  And,

3    therefore, the intent of the FAA, which is that

4    arbitration clauses be interpreted or applied according

5    to their terms, is fulfilled by incorporating the

6    provisions of NASD and FINRA which don't allow for

7    arbitration of class claims.

8              I did not see a response from your side

9    directly to that.  What -- what do you say to that?

10             MR. SHAULSON:  Sure, Your Honor.  First of

11   all, as I understand the Plaintiffs' argument, they're

12   trying to say that only the PartnerPlus arbitration

13   provision is applicable.  That incorporates FINRA or

14   NASD rules, and FINRA rules, therefore, allow or don't

15   prohibit a class action.

16             Let me explain why UBS believes that to be a

17   baseless argument.

18             THE COURT:  Okay.

19             MR. SHAULSON:  First of all, the PartnerPlus

20   arbitration provision is expressly subject to exhaustion

21   of the claims procedure set forth in the PartnerPlus

22   Plan.  Therefore, it basically says, subject to

23   exhaustion of Section 10.1, or whatever the applicable

24   provision is that has a claims procedure.

25             Now, the Plaintiffs argue that they're not

```
 1   bringing a claim for benefits under the terms of

 2   PartnerPlus.  They're bringing a statutory claim under

 3   ERISA.

 4            Now, if they're bringing a statutory claim

 5   under ERISA, they argue, we don't have to exhaust our

 6   administrative remedies.  But this is not a statutory

 7   issue.  This is not a question of whether ERISA requires

 8   exhaustion.  The contract, according to its terms,

 9   requires exhaustion before you even get to arbitration

10   under the PartnerPlus Plan.  That's number one.  So the

11   PartnerPlus arbitration provision is not applicable here

12   at all.

13            Number two, the partnership plan arbitration

14   provision also is not applicable here, doesn't even come

15   into play because that arbitration provision is

16   specifically limited to claims that arise out of the

17   PartnerPlus Plan.  Now --

18            THE COURT:  Right.  Just so I'll understand,

19   what you're -- you're not disputing, then, that the

20   PartnerPlus arbitration clause does not provide for

21   arbitration of class claims?

22            MR. SHAULSON:  The PartnerPlus --

23   absolutely.  The PartnerPlus Plan does not specifically

24   preclude an individual from bringing a class claim, and

25   it references FINRA, which I'm going to get to in just
```

1    30 seconds, but I want to cover this point about why

2    the PartnerPlus arbitration provision doesn't apply at

3    all.

4              THE COURT:  Well, I understand we're going

5    to get to that.

6              MR. SHAULSON:  Yeah.

7              THE COURT:  But first I want to make sure

8    that you are in agreement with the Plaintiffs that UBS

9    cannot compel arbitration of class claims under the

10   PartnerPlus arbitration clause.

11             MR. SHAULSON:  I think it can because it

12   incorporates the FINRA rules, and the FINRA rules

13   specifically allow other agreements to co-exist with

14   the FINRA rules and another agreement.  And there are

15   other arbitration agreements which Plaintiffs signed

16   which they agreed to arbitrate only on a non-class

17   basis.

18             THE COURT:  Well, then, you'd be compelling

19   arbitration under those arbitration clauses.

20             MR. SHAULSON:  Reading both arbitration

21   provisions in harmony, correct.

22             THE COURT:  So absent some other agreement

23   that provides for arbitration of class claims, UBS does

24   not try to get there under the PartnerPlus arbitration

25   clause?

1          MR. SHAULSON:  I think that's generally

2     true, Your Honor.  I think that's true.

3          THE COURT:  Okay.

4          MR. SHAULSON:  We're not -- we are -- we are

5     telling the Court that you should compel arbitration

6     under other arbitration agreements, not the PartnerPlus

7     arbitration agreement.

8          THE COURT:  Direct me to the other

9     arbitration agreement that you're relying on.

10          MR. SHAULSON:  Okay.  So, for example, the

11     last arbitration agreement that was -- went into effect

12     for each individual Plaintiff contained an express

13     class action waiver.  So, for example, Mr. Eddingston

14     and Mr. Hendricks are bound by the 2008 compensation

15     plan.

16          THE COURT:  And which exhibit to your motion

17     is that?

18          MR. SHAULSON:  So if you look at the

19     Ferreira declaration, Paragraphs 15 and 21, and Exhibits

20     13, 21, and 22.

21          THE COURT:  Do you have the exhibit?

22          MR. SHAULSON:  Do you want me to use the

23     ELMO, Your Honor, or --

24          THE COURT:  I -- I have your motion, so if

25     you can tell me what exhibit it is, I can find it, I

1    think.

2              MR. SHAULSON:  So the Eddingston motion,

3    Exhibit 7, is the Financial Advisor Compensation Plan.

4              THE COURT:  That -- that one, just by

5    coincidence, only prints out the headings of the

6    paragraphs when you print the copy that was filed.  I

7    think it may have something to do with the colors, so

8    you can go ahead and use the ELMO.

9              I -- the other exhibits around it, the one

10   before it, the 2007 and the one after it, the 2009, did

11   print out, but would -- would it hurt your argument to

12   go with the exhibits, the one for 2007, Exhibit 6, or

13   the one for 2009?  Is there something different about

14   2008?

15             MR. SHAULSON:  We can go with 2009.

16             Which one is the 2009 one?

17             THE COURT:  Okay.

18             MR. SHAULSON:  Exhibit 8, Your Honor.

19             THE COURT:  Yes, I've got that.

20             MR. SHAULSON:  So Exhibit 8, Page 19, is the

21   arbitration provision.

22             THE COURT:  Now, is -- is this document,

23   this Exhibit 8, an actual plan document, or is this a

24   summary?

25             MR. SHAULSON:  No.  What this is, Your

1   Honor, and I think counsel is trying to be consistent

2   with the local rule of not providing you with pages

3   upon pages on pages that's not relevant.  This is part

4   of  an overall Financial Advisor Compensation Plan,

5   which I'm happy to hand up and you can see the entire

6   plan.

7            The Financial Advisor Compensation Plan is

8   a -- you know, a document which basically sets forth the

9   terms and conditions of compensation for the financial

10  advisor.  On one page, as you can see, that we've --

11  actually two pages, it summaries the PartnerPlus Plan,

12  but it's a self-contained Financial Advisor Compensation

13  Plan which is acknowledged by the financial advisor, and

14  then there's a separate arbitration provision that goes

15  with the financial advisor plan, and that's what you see

16  on Page 19.

17            THE COURT:  Well, what I see on Page 19 is

18  not part of the summary that starts on Page 14, then?

19            MR. SHAULSON:  Correct.  Those are just

20  pages from the Financial Advisor Compensation Plan.

21            THE COURT:  Well, then I --

22            MR. SHAULSON:  Should I hand this up to you

23  and -- and you can see what the full document is?

24            THE COURT:  I think I do need to see the

25  full document.  Have you -- does the Plaintiff has --

1  have that, as well?

2          MR. STRIS:  Yes, Your Honor.

3          THE COURT:  Okay.  Now, Mr. Shaulson, this

4  arbitration clause on Page 19, which I guess is also

5  included in the Exhibit 8, also says it will be

6  conducted under the rules of FINRA; is that right?

7          MR. SHAULSON:  Correct, Your Honor.  And

8  FINRA rules -- specifically FINRA Rule 13204 expressly

9  permits the use of other arbitration agreements, and the

10  Courts have universally held that other agreements can

11  override the standard FINRA rules, including

12  specifically in the context of a class action waiver

13  where courts have repeatedly held, including the exact

14  plan we're looking at, the Financial Advisor

15  Compensation Plan at UBS.

16          The LaVoice Court, the Cohen Court, the

17  Lewis Court all have concluded that the incorporation

18  of FINRA rules does not mean that you can bring your

19  claims on a class action basis.  Where you have a

20  separate agreement that confines claims that are

21  subject to arbitration to individual non-class claims,

22  the individual agreement trumps the standard FINRA

23  rules.

24          THE COURT:  Now, it was difficult to tell

25  from Lewis and LaVoice that they were dealing with this

1    same plan, or at least they -- they didn't reference the

2    PartnerPlus Plan that I could tell, but...

3              MR. SHAULSON:  That's correct, Your Honor,

4    they were not dealing with the PartnerPlus Plan.  They

5    were dealing with the Financial Advisor Compensation

6    Plan, and they enforced arbitration pursuant to that

7    plan.  But, Your Honor, it was exactly the same

8    argument, whether it was PartnerPlus or the U4, the

9    standard uniform application for securities dealers, it

10   was the same argument that the -- that the FINRA rules

11   were incorporated therein, and, therefore, you couldn't

12   have class claims.

13             THE COURT:  Well, the difference was that

14   the PartnerPlus Plan doesn't waive class action, that I

15   could tell.

16             MR. SHAULSON:  But just because it's

17   incorporating FINRA rules, but that's true of the U4, as

18   well.

19             THE COURT:  I mean, it does not have an

20   express class action waiver in it like what you're

21   citing to me now, this Financial Advisor Compensation

22   Plan does.

23             MR. SHAULSON:  Prior to 2011, that's true,

24   Your Honor.

25             THE COURT:  And your contention is that 2011

1   is not at issue here?

2            MR. SHAULSON:  The 2011 plan is at issue

3   for two of the named Plaintiffs, Mr. Ellspermann and

4   Mr. Roccisano.  They both signed both the 2011

5   PartnerPlus Plan and the 2011 compensation plans.  But

6   for the other individuals who worked prior to 2011,

7   the arbitration agreement found in the latest

8   agreement applicable to them had a class action waiver

9   in it.

10            THE COURT:  So your contention with respect

11   to the pre-2011 agreements is that the class action

12   waiver in this Financial Advisor Compensation Plan also

13   waives class actions under the PartnerPlus --

14            MR. SHAULSON:  Absolutely, Your Honor.

15            THE COURT:  -- Plan?

16            MR. SHAULSON:  And -- and before you even

17   get to this issue, we have to analyze what is arbitrable

18   under the PartnerPlus arbitration provision.  I

19   mentioned, as a contractual matter, Plaintiffs never

20   exhausted the remedies under the plan, and, therefore,

21   the PartnerPlus arbitration provision never becomes

22   applicable at all.

23            Secondly, the arbitration provision in

24   PartnerPlus specifically only covers claims that arise

25   out of the PartnerPlus Plan.  Plaintiffs in this case

1    are taking the position that their claims don't arise

2    out of the PartnerPlus Plan.  And the reason they're

3    making that argument is they're arguing that under

4    ERISA, they don't have a statutory obligation to

5    exhaust their administrative remedies under the plan,

6    so they're saying our claims don't arise out of the

7    plan.

8              And I'll refer the Court to the IDEA

9    Corporation case, 545 F.Supp. 2d 600, from the Western

10   District of Texas, where the Court looked at what is the

11   scope of an arbitration agreement, a broad versus a

12   narrow arbitration agreement?

13             And what the Court said is that arising out

14   of a contract, when the -- when the parties use the

15   word, quote, arising out of a contract, end quote,

16   that's to be given a narrow construction to claims that

17   arise solely under the contract.

18             In contrast to the Financial Advisor

19   Compensation Plan and the Branch Manager Compensation

20   Plan, for example, where there's an express class

21   waiver, those contracts cover any disputes between the

22   parties at all, whether they're employment disputes,

23   compensation disputes, benefit disputes, and

24   specifically disputes arising under the very statute

25   Plaintiffs are trying to bring their claim, ERISA.

1              So the IDEA Court case said that we are

2       going to compel arbitration under the broader

3       arbitration provision contained in another agreement,

4       not under the narrow arbitration agreement that said

5       disputes arising out of the plan.

6              THE COURT:  All right.

7              MR. SHAULSON:  And I also refer the Court to

8       Brandl versus ACE USA, 2011 Westlaw 12 --

9              THE COURT:  Let me just interrupt you.

10             MR. SHAULSON:  Sure.

11             THE COURT:  I -- I can only hold so many

12      thoughts in my head at once, and what I'd like to do is

13      to hear from the Plaintiffs on the -- these first couple

14      of points that we've addressed so I can figure out

15      where -- where the dispute really is.  But I promise, I

16      will hear more from you.  Thank you, Mr. Shaulson.

17             MR. SHAULSON:  Okay.  Thank you, Your Honor.

18             THE COURT:  And let me see, you are?

19             MR. STRIS:  Mr. Stris -- Peter Stris.

20             THE COURT:  Stris.  All right.  Thank you.

21      I -- I know you've been introduced once, I'm just -- I

22      need to remember better.

23             MR. STRIS:  I understand.

24             THE COURT:  Mr. Stris, a couple of things.

25      First off, in the briefs, Plaintiffs spent a while

1    talking about how what we had on the FA -- the Financial

2    Advisor Compensation Plan was just a summary plan

3    document which looked like a good argument when all I

4    had was those pages.  But in view of the larger

5    agreement, the more complete copy of that that's been

6    made available to me now, it does not look like that

7    arbitration clause at the end of that and the -- which

8    includes the class action waiver, was part of the

9    summary part of the document but rather part of the --

10   the plan itself.

11           What -- what do you say to that?

12           MR. STRIS:  Yeah, let -- let me address that

13   directly because I think that's a critical issue that I

14   can clear up.

15           THE COURT:  Okay.

16           MR. STRIS:  And I think here's how I'd like

17   to go about it.  If you take the document that was just

18   handed to you that is now in total 25 pages, and on the

19   cover it -- it says, Financial Advisor Compensation

20   Plan, so that we're looking at the same thing --

21           THE COURT:  Yes.

22           MR. STRIS:  -- this is what we refer to in

23   our papers repeatedly as a summary brochure.

24           Let me walk through how it works so that

25   we're all on the same page.  If you look at the table of

 1    contents on Page -- it's before Page 1, there's 10

 2    sections.  The first one is called Production Payout.

 3    Do you see that, Your Honor?

 4              THE COURT:  Yes.

 5              MR. STRIS:  Some of these sections are

 6    stand-alone.  In other words, we mentioned this in a

 7    footnote in -- in our papers.  This document describes

 8    different ways our clients could get money.  The only

 9    section of this document, however, that's relevant to

10    this case at all is Section 5.  It begins on Page 14,

11    and in the table of contents, it's labeled UBS

12    PartnerPlus/UBS Financial Advisor Deferred Award Plan.

13    Do -- do you see that?

14              THE COURT:  Yes.

15              MR. STRIS:  Okay.  So if you turn to that,

16    that section, it couldn't be clearer that this section

17    is a summary.  And I would -- I would refer you to Page

18    15 --

19              THE COURT:  I -- I would agree that this

20    section is a summary of the PartnerPlus Plan.

21              MR. STRIS:  Okay.  And -- and let me explain

22    why that matters.  On Page 15 -- and I'm going to quote

23    what it says here.  It says, if there is any difference,

24    any difference, between this summary and the plan

25    document, the plan document will govern.

```
 1                Now, here's why this matters for purposes of
 2     arbitration.  The PartnerPlus Plan document has an
 3     arbitration provision in it.  And I'd like to, if you'd
 4     indulge me in a minute, tell you why we unquestionably
 5     win under that provision.  Because this document here
 6     says, if there's any conflict, the plan governs, what
 7     that means as a simple matter of contract law is that
 8     the only arbitration language that this Court can look
 9     at is the arbitration language in the PartnerPlus Plan.
10                THE COURT:  Now, that -- that's assuming
11     that the claims are all made under the PartnerPlus Plan
12     and also I think assuming that -- that this other
13     arbitration clause doesn't apply to it.
14                MR. STRIS:  Yes.  And so could -- could I
15     speak to that for a moment?
16                THE COURT:  Well, first off, just so we're
17     clear, the -- when it says, in the event of a conflict
18     between the summary of the plans set forth in this
19     document, that's referring to the two-page summary of
20     the PartnerPlus Plan, which is 14 and 15, and maybe --
21     maybe a summary of some other plan that could be
22     elsewhere.  But it's not saying if there's any conflict
23     between what's on Page 19, which is the arbitration
24     clause of the Financial Advisor Compensation Plan.
25                MR. STRIS:  Well, I -- I wouldn't read it
```

1  that way, and I could tell you that if this is governed

2  by ERISA, taking into account the recent Supreme Court

3  Amara decision and a history of law that spans virtually

4  every circuit on the difference between a plan document

5  and summaries, there's no way that any page in this

6  document could trump the plan.

7          Now, I -- I submit it's a closer question --

8          THE COURT:  Well, this document is a

9  separate plan, isn't it?

10          MR. STRIS:  Oh, certainly not.

11          THE COURT:  This -- the Financial Advisor

12  Compensation Plan, you're saying is not --

13          MR. STRIS:  It -- it would not meet any of

14  ERISA's requirements, nor -- let me be clear.  UBS is

15  not taking the position that this is an ERISA plan.  In

16  fact, they claim that neither of the documents are an

17  ERISA plan.  Under ERISA, in order for something to

18  constitute a plan document, there's a list of rigorous

19  requirements that need to be met, and they clearly are

20  not met here.

21          THE COURT:  I guess I'm not trying to make a

22  finding that this is a plan document under ERISA, but

23  this is -- this is the Financial Advisor Compensation

24  Plan.

25          MR. STRIS:  That's what --

```
 1              THE COURT:  This is not a summary of it?
 2   This is the plan itself?
 3              MR. STRIS:  Well, let me take a step back
 4   and sort of at least explain to you what our argument
 5   is.
 6              THE COURT:  Okay.
 7              MR. STRIS:  Our argument is that the
 8   PartnerPlus Plan is an ERISA plan.
 9              THE COURT:  Okay.
10              MR. STRIS:  And I think as a procedural
11   matter, that needs to be accepted as true because either
12   what you're faced with is a motion to dismiss, in which
13   case you have to accept our allegations as pled, and we
14   plead that it's an ERISA plan, or this comes to you as a
15   summary judgment motion, in which case, as we say in our
16   brief, the law is pretty clear, whether something
17   constitutes an ERISA plan is based on the totality of
18   the facts and circumstances.
19              THE COURT:  I -- I don't have a problem with
20   at this point assuming that the PartnerPlus Plan is an
21   ERISA plan --
22              MR. STRIS:  Okay.  So can I tell you what --
23              THE COURT:  -- for purposes of this motion.
24   Yes.
25              MR. STRIS:  So I just want to tell you what
```

```
 1    flows from that so that you sort of see what our

 2    position is.

 3              THE COURT:  Okay.

 4              MR. STRIS:  If we -- if we all accept that

 5    for purposes of this motion the PartnerPlus Plan is an

 6    ERISA plan, then we're stuck with the law of ERISA.  And

 7    the law of ERISA says that any peripheral document, it

 8    doesn't matter if you label it a plan, a contract, an

 9    omnibus document, you could put whatever label you want

10    on it, if it's not the formal plan document, it can't

11    trump the plan.

12              So if -- if we accept, for purposes of this

13    motion, that the PartnerPlus Plan is governed by

14    ERISA -- and that's why UBS throughout their papers

15    tries to resist that characterization because they

16    understand what flows from that -- none of this is

17    relevant.  And we don't need to parse the language of

18    whether the conflict or the difference has to be only

19    Pages 14 and 15 or if it also includes the final page on

20    arbitration.

21              THE COURT:  It -- all right.  You're saying

22    that your position is that if -- or because the

23    PartnerPlus Plan is governed by ERISA, no separate

24    arbitration agreement or class action waiver can cover

25    it.
```

1           MR. STRIS:  Unless it complies with 29

2    U.S.C. 1024, which sets -- and it's a piece of ERISA.  I

3    apologize, I know this is boring.  But it's a piece of

4    ERISA that explains the rigorous requirements that need

5    to be met if you want to modify a term of the plan

6    itself.

7           THE COURT:  So -- and are you relying solely

8    on the PartnerPlus Plan for your claims in this case?

9           MR. STRIS:  No.  But -- and I'm happy to

10   move on to why I didn't think we win even under this

11   document, if that's what you'd like, but I -- I -- I

12   don't want to move on unless we're on the same page

13   about what our argument is under the PartnerPlus Plan.

14          THE COURT:  Okay.  Well, I think I

15   understand your argument is that -- you were saying

16   unless it complies with section, what, now of ERISA?

17          MR. STRIS:  29 U.S.C. 1024 says that any

18   time you want to modify -- make a material modification

19   to a plan document --

20          THE COURT:  Section 524 of ERISA, is that

21   the --

22          MR. STRIS:  Oh, I actually don't know what

23   the -- I know the U.S. Code cite.

24          THE COURT:  Okay.

25          MR. STRIS:  I don't know which sub provision

 1    it is at ERISA.

 2              THE COURT:  All right.

 3              MR. STRIS:  And -- and that's critically

 4    important because -- and you started your questioning of

 5    my colleagues on this point.  We're -- we're taking the

 6    position that the arbitration provision in PartnerPlus

 7    adopts the FINRA rules.  We're not arguing that FINRA

 8    trumps anything.

 9              THE COURT:  No, I understand that.

10              MR. STRIS:  Okay.

11              THE COURT:  The -- do you have authority

12    that you can cite, just something specific, that no

13    arbitration clause or waiver in a separate document can

14    govern a claim under an ERISA plan?

15              MR. STRIS:  I would point you to the section

16    of our opposition, and I believe it's -- it's argument

17    Section 3(b).  It cites the statute, 29 U.S.C. 1024,

18    and it also cites the enabling regulations.  And if you

19    look at those regulations and the statute, I'm not sure

20    I've ever seen a case where someone attempted to do

21    what you're describing, but I think the regulations and

22    the -- and the statute will speak for themselves.

23              THE COURT:  Well, unfortunately, they don't

24    talk to me.  So have you got access to them now?

25              MR. STRIS:  Yeah, I can grab them.

```
 1              THE COURT:  Okay.

 2              MR. STRIS:  Okay.  Let me -- I'm sorry.

 3   Your Honor, let me -- let me point you -- you're --

 4   point you in two directions.  The first, before I get to

 5   the statute, is we cite the -- the seminal Amara case

 6   from the Supreme Court.  This is on Page 17 of our

 7   motion.  It's a 2011 Supreme Court ERISA case, 131 S.

 8   Ct. 1866.  And so you really don't need to even go any

 9   further than that Supreme Court case.  It says, summary

10   documents, important as -- as they are, do not

11   themselves constitute the terms of the plan.

12              THE COURT:  Right.  That -- that's not

13   controversial.  I understand that.

14              MR. STRIS:  Okay.  And we cite a series of

15   cases from throughout the country after that that

16   explain that it's not just a summary plan description,

17   any peripheral document, if it has terms that are less

18   favorable than the plan, they can't be enforced.

19              THE COURT:  These are almost all talking

20   about documents generated by the company, as opposed to

21   an agreement signed by the employee and that --

22              MR. STRIS:  Well, I don't know -- I would

23   say that the agreement that was signed by the employee

24   here was generated by the company, and I'm not sure --

25   and I'm not sure that that distinction, for purposes of
```

1   ERISA, would matter.  But if you don't accept that, let

2   me point you to the statutory warrants.

3           THE COURT:  I just am looking for a case,

4   and if you don't have one, there's no shame in saying,

5   I don't have one, but I'm -- if -- if you do, it would

6   be helpful, and that is a case that says that an

7   agreement outside of the ERISA plan can't -- cannot bind

8   the employee regarding arbitration or -- or class action

9   waiver.

10           MR. STRIS:  I don't, because I've never seen

11   anyone attempt to do this --

12           THE COURT:  Okay.

13           MR. STRIS:  -- frankly.  And maybe that's a

14   good segue into two of the things that I wanted to talk

15   about, most importantly these other cases, you know,

16   what I like to talk about the UBS success stories, the

17   LaVoice case and the Lewis case.  They really provide

18   perfect evidence of -- of why our position is right.

19           Let's take LaVoice for a minute.  LaVo --

20   first of all, none of these cases involve the

21   PartnerPlus Plan, which is not a big surprise because

22   none of them involved pension claims.

23           So let's take LaVoice.  It didn't involve

24   the PartnerPlus Plan, so the relevant arbitration

25   provision that we keep talking about wasn't present.

1           Number two, it didn't involve a class

2    action, so the relevant exception to arbitration in the

3    plan document wasn't at issue.

4           And number three, it didn't involve an

5    asserted claim for injunctive relief.

6           So I guess one of the reasons perhaps I'm

7    struggling to find a case to point to you to say, hey,

8    UBS can't do what it's trying to do here is because I

9    haven't seen attempts to do this.  I haven't seen

10   attempts to circumvent a clear arbitration provision in

11   a pension plan in a pension case by looking at some sort

12   of peripheral document.

13          And for -- for good reason we cited the --

14   the Nielsen case, this is the 1995 Seventh Circuit

15   case.  The -- the language is almost identical to a

16   word, Your Honor.  To a word, the contractual language

17   is the same.

18          And what typically happens in these cases --

19   and I have a feeling that it didn't happen here because

20   we're talking about a very large class action of

21   potentially over a hundred million dollars.  You don't

22   typically see an attempt to use the wrong arbitration

23   provision.

24          And -- and let me be clear, the arbitration

25   provision in the pension plan would require everything

1    but a class action to go to arbitration.

2            THE COURT:  Well, now, you -- you've said

3    you're not making just claims under the pension plan; is

4    that right?

5            MR. STRIS:  I -- I want to be careful about

6    how I put this.  All of our claims arise out of the

7    pension plan.  They may not be -- they may not be for

8    benefits under the plan, but this new argument that I

9    heard from my colleague, you know, a few minutes ago was

10   actually very surprising to me.  He says, well, under

11   the provision in the PartnerPlus Plan, you only

12   arbitrate claims arising out of the plan.  And he cited

13   a few cases that admittedly are -- are new.  I'm not

14   familiar with them.  But he says, they stand for the

15   proposition that it has to be a claim that is solely

16   under the contract.

17           That's precisely what our claims are.  We

18   wouldn't have claims but for the existence of the

19   contract.  Our whole point is that we're not being --

20   UBS is attempting to enforce provisions in the

21   PartnerPlus Plan that are illegal.

22           So there's a difference between us seeking

23   benefits under the plan, which we admittedly are not

24   doing, and us seeking a remedy that's totally apart from

25   the plan.  Every one of our claims arises out of the

1   plan.

2            THE COURT:  The only claims you're asserting

3   deal with your right to pension benefits?

4            MR. STRIS:  That's correct.

5            THE COURT:  Okay.  Now -- so your -- your

6   answer to the effort to apply the broader arbitration

7   clause in the Financial Advisor Compensation Plan is

8   that since it does not meet the requirements of ERISA,

9   it cannot modify the pension plan arbitration clause?

10           MR. STRIS:  That's correct.  And I'm happy

11  to defend our position, even if the Financial Advisor

12  Compensation Plan arbitration provision were the

13  governing one.  I don't think it is.  But, frankly, I

14  don't think that it would change the outcome in this

15  case because there's an explicit carve-out for

16  injunctive claims.

17           And we know -- this is Page 13 of our

18  opposition.  We explained at length how the -- the very

19  essence of our complaint in this case is one seeking

20  injunctive relief.  Section 5 -- Section 29 U.S.C.

21  1132(a)(3) allows you to seek an injunction whenever

22  there's something that -- in a plan that violates the

23  statute.

24           THE COURT:  Yeah, but how can you say the

25  very essence of your case is seeking injunctive relief

1   when damages is -- is what your clients are after, is it

2   not?

3          MR. STRIS:  Well, I -- I wouldn't agree with

4   that characterization because there's --

5          THE COURT:  Do you want damages?

6          MR. STRIS:  We want -- we want money, but

7   damages, the Supreme Court has made very clear, under

8   ERISA is -- is a different species.

9          I -- I think where -- I'd point you to the

10  Johnson case -- this was recently litigated in the -- in

11  the Seventh Circuit -- where this exact same issue came

12  up.  And, in fact, the same counsel that represents UBS

13  here today made this argument in that case.  And Judge

14  Posner rejected it as silly.  He basically said, just

15  because the consequence of the injunction is money

16  doesn't mean that you're not seeking injunctive relief.

17         UBS responds in a footnote by saying they

18  respectfully disagree with that decision, but that

19  decision used years of -- of U.S. Supreme Court

20  precedent under the meaning of equitable relief in that

21  statutory provision.  It's weird.  I -- look, I admit

22  the -- the way the Supreme Court has interpreted --

23  interpreted that provision is strange, but that's what

24  we're stuck with.

25         THE COURT:  Well, Judge Posner is not your

1   best resource in this Court, but I --

2           MR. STRIS:  Well, I -- as a Plaintiff's

3   lawyer, I very rarely find myself agreeing with Judge

4   Posner, but when he comes down not only on the side of

5   Plaintiffs but forcefully so, I think it says something

6   sort of about the -- the strength of -- of the argument

7   that's coming from the -- the pension Defendant.

8           And what he essentially did was reject the

9   notion that this kind of claim, even though it's --

10  ultimately it hopes to resolve itself by an award of

11  money, he rejected the notion that that's not one for --

12  for injunctive relief under the statute.

13          That's the whole point of the CIGNA case.

14  You can -- you can seek an injunction, you can seek

15  reformation.  These are all equitable remedies, but,

16  yeah, they end up getting you money, that's true.

17          THE COURT:  And the -- but in any event,

18  getting back to your argument about this carve-out,

19  you're -- you're suggesting that the -- that opening

20  clause covers everything else in the paragraph?

21          MR. STRIS:  That's our position.  I mean,

22  I -- I -- and I would say I think it's pretty clear

23  because as I understand UBS's argument, and maybe I

24  don't, but as I understand it, they seem to be focusing

25  on the fact that because the -- the provision

1   specifically references ERISA, oh, well, it can't apply

2   to ERISA claims.

3            But if that's true, it would negate

4   everything.  The -- the way the provision reads, it

5   says, with the exception of claims for injunctive

6   relief, everything else is arbitrable.  And it lists all

7   these different statutes.

8            So the -- the fact that it's listing

9   specific statutes, all that means is that if it's not a

10  claim for injunctive relief, you have to arbitrate

11  causes of action under those statutes.

12           THE COURT:  It actually says, with the

13  exception of claims for injunctive relief for the

14  denial of benefits under the firm's disability or

15  medical plan.

16           MR. STRIS:  It depends on -- it depends on

17  the version we're looking at.  Some versions say that,

18  that's true.  But I don't think that really affects our

19  argument.

20           THE COURT:  Well, it depends on where you

21  take a breath, but I -- I do have a hard time saying

22  that that sentence that starts midway down the second

23  column, by agreeing to the terms of this compensation

24  plan, that that somehow is falling under the -- with the

25  exception of claims for injunctive relief.

```
 1              MR. STRIS:  That's an interest -- that's an
 2   interesting point.  I have -- if you would permit me, I
 3   have -- I have some thoughts on that.
 4              THE COURT:  Okay.
 5              MR. STRIS:  I -- I think for -- for perhaps
 6   a counterintuitive reason, it has to include that,
 7   and -- and let me tell you why.
 8              THE COURT:  All right.
 9              MR. STRIS:  There's -- this -- this
10   provision, it's no accident that it's all under one
11   heading called Arbitration.  And the reason why is if
12   you put a class action waiver in a contract that is not
13   linked to arbitration -- let's say you just decide you
14   want to have a contract that says, you waive your right
15   to a class action, the FAA doesn't apply, and if -- and
16   if that were the case here, I would like new briefing.
17              I'd get up and I'd argue under -- I don't
18   care if it's Texas law, New Jersey, New York, I'd argue
19   it's unconscionable.  I'd have all these defenses to the
20   class action waiver.
21              UBS doesn't want me to make those arguments.
22   They want to -- they want to cloak themselves in the
23   protection of the Federal Arbitration Act, and I don't
24   blame them.  And the way they did that is by linking the
25   class action waiver to the arbitration provision.  They
```

1    can't have it both ways.  Once they link the two and get

2    us into the world of the FAA, which is what they want, I

3    get to argue -- and I think with no real persuasive

4    response -- that this carve-out for injunctive relief

5    applies to everything.  And the class action waiver is

6    only a waiver to the arbitrable claims.

7               Now, if you end up disagreeing, I would -- I

8    would ask permission for us to brief the -- the

9    permissibility of the class action waiver, but this is

10   never -- this isn't the posture with which it's come to

11   this Court.

12              THE COURT:  All right.  Well, let -- what

13   I'd like to do is to hear the response from the defense

14   to what you've said about all of your claims rising

15   under the PartnerPlus Plan and its arbitration clause.

16              MR. SHAULSON:  Thank you, Your Honor.

17              THE COURT:  Mr. Shaulson, if -- first off,

18   just with the argument that all the claims arise under

19   the PartnerPlus pension plan, what can you point me to

20   that shows that that's not the case?

21              MR. SHAULSON:  Sure.  Just look at the

22   Hendricks opposition, Note 13.

23              THE COURT:  Let's see, can we work from the

24   Eddingston?  That just happens to be the one that I --

25   they appear to me to be largely the same, so I've

```
 1   concentrated on one book.  Since that was the older
 2   case, I picked it.  But -- so if it's the same note,
 3   then that's great.
 4              MR. SHAULSON:  Can you give me just one
 5   minute, Your Honor?
 6              THE COURT:  Sure.
 7              MR. SHAULSON:  So, Your Honor, on Page -- on
 8   Page 16, Note 14 --
 9              THE COURT:  All right.
10              MR. SHAULSON:  So, basically, what they're
11   saying here is that UBS Pension Plan -- really the
12   PartnerPlus Plan, but -- only requires administrative
13   exhaustion when an individual is seeking benefits under
14   the plan.  And then they specifically say they're not
15   seeking benefits under the plan, they're seeking at the
16   end of the note to invalidate an illegal plan term need
17   not first present their case to the party charged with
18   imposing the illegal term.
19              So notwithstanding what counsel just argued
20   to try to fit within the PartnerPlus arbitration
21   provision, they have taken the position in both briefs
22   that this is not a claim that arises under the
23   PartnerPlus Plan, it arises --
24              THE COURT:  Well, now --
25              MR. SHAULSON:  -- under ERISA.
```

```
 1                    THE COURT:  They're not saying that the

 2   claim doesn't arise out of the -- the pension plan.

 3   They're saying they're not seeking benefits, isn't that

 4   what --

 5                    MR. SHAULSON:  Well, I think the -- well, I

 6   think the import of what they're arguing is that our

 7   claim is a statutory claim and solely a statutory claim

 8   and that it doesn't arise out of the plan.  In fact,

 9   they want to amend the plan.  They want to reform the

10   plan.

11                    THE COURT:  Where do they say that it

12   doesn't arise out of the plan?  Because there's a

13   difference between that and --

14                    MR. SHAULSON:  Well, it may -- if it arose

15   out of the plan, then they would have to exhaust their

16   administrative remedies.

17                    THE COURT:  Well, they're -- they're saying

18   that it's only if it's a claim for benefits that they

19   have to exhaust remedies.

20                    MR. SHAULSON:  Correct.  But I --

21                    THE COURT:  And are they making a claim for

22   benefits, in your opinion?

23                    MR. SHAULSON:  I think they are seeking --

24   they want money under the plan.  They want the benefits

25   under the plan.
```

```
 1              And here -- here's the thing, Your Honor.
 2   It doesn't matter which way -- which way they go here.
 3   Either they're seeking benefits under the plan, in which
 4   case they had an obligation -- contractual obligation to
 5   exhaust, and they can't invoke the PartnerPlus
 6   arbitration provision because they didn't exhaust.  And
 7   it says, subject to exhaustion under Section 10.2, and
 8   then it proceeds to arbitration.  If they want to bring
 9   a claim for benefits under the plan, they had to
10   exhaust.  If they don't want to bring a claim for
11   benefits under the plan and they're taking the position
12   that this doesn't arise out of the plan -- let -- let
13   me -- let me address your question this way because I --
14   I understand your point.
15              It doesn't even matter what they're arguing.
16   What matters is the case law.  And the case law that I
17   cited to you before, the Western District of Texas case,
18   talked about what does language mean when it says, arise
19   out of a contract?  When it arises out of a contract,
20   it's limited to claims --
21              THE COURT:  You know, I --
22              MR. SHAULSON:  -- for benefits under the
23   contract.
24              THE COURT:  Have you got something better
25   than a district court case on that?  That's -- I mean,
```

1    if we're talking black letter law, there should be

2    some -- something from on high, but in any event --

3             MR. SHAULSON:  Well, that -- that case, Your

4    Honor, I could pull it, but that case does survey other

5    cases making the same point.

6             THE COURT:  That --

7             MR. SHAULSON:  I can't tell you whether it

8    looks to a Fifth Circuit case or not, but it does refer

9    to other cases making exactly the same point.

10            And with respect to counsel's argument that

11   we've never seen this before, you know, Your Honor

12   observed that the arbitration clause contained in the FA

13   compensation plan -- the FA compensation plan is a

14   separate agreement.  It stands alone.  And that

15   arbitration agreement, of course, can be enforced,

16   notwithstanding the PartnerPlus Plan.  And I'll refer

17   the Court to --

18            THE COURT:  Are you saying it can be

19   enforced against claims arising under the -- the ERISA

20   plan?

21            MR. SHAULSON:  Absolutely.  And, in fact,

22   the Supreme Court has -- I'm sorry, the Third Circuit,

23   the Second Circuit have enforced arbitration agreements

24   in a collective bargaining agreement trumping an ERISA

25   plan or -- or an SPD, United States versus DuPont.

```
 1              THE COURT:  This is not a collective
 2  bargaining agreement.  That --
 3              MR. SHAULSON:  But it's -- it doesn't
 4  matter.  These are contractual principles.
 5              THE COURT:  I -- I just know collective
 6  bargaining agreements have their own great set of -- of
 7  statutory law surrounding them.
 8              MR. SHAULSON:  Well, Your Honor, so does the
 9  FAA, but counsel told you that nothing can trump an
10  ERISA plan.  That's what he told you.  Nothing can trump
11  an ERISA plan, and the claims procedure in the ERISA
12  plan has to prevail.
13              We know that not to be true because of the
14  cases DuPont, 388 Federal Appendix 209, Third Circuit,
15  and United States Steel versus DuPont, 565 F.3d.
16              THE COURT:  And those are both --
17              MR. SHAULSON:  '99.
18              THE COURT:  -- collective bargaining
19  agreement cases?
20              MR. SHAULSON:  Correct.  I'll give you
21  another case, Your Honor, which is not a collective
22  bargaining agreement.
23              THE COURT:  Okay.
24              MR. SHAULSON:  And that is Brandl,
25  B-r-a-n-d-l, versus Ace USA, 2011 Westlaw 129422,
```

1    Eastern District of Pennsylvania case that compelled

2    arbitration of ERISA claims under a broad, quote,

3    employment dispute resolution policy, end quote, not the

4    ERISA plan document that had no arbitration contract in

5    it.

6              The reality is, Your Honor, ERISA claims are

7    compelled to arbitration all the time under employment

8    policy handbooks, employment agreements.  It doesn't

9    need to be in an actual plan document.

10             What -- what counsel is arguing is a

11   standard provision that no one is debating, that in

12   terms of modifying a pension plan under ERISA, you can't

13   modify it through a summary plan description.  Counsel

14   has not provided to you, because he can't provide to

15   you, case law which says that an arbitration provision

16   in a separate non-ERISA document can't have a valid

17   arbitration agreement over claims for benefits or claims

18   for benefits under an ERISA plan or ERISA statutory

19   claims --

20             THE COURT:  Okay.

21             MR. SHAULSON:  -- because it's just not

22   true.

23             Now, counsel argues that you should just

24   accept the fact that this is an ERISA-governed plan.

25   UBS wholly disagrees with that.  The issue of whether

```
 1    this is an ERISA plan is a dispute between the parties

 2    that is subject to arbitration.  And under the Federal

 3    Arbitration Act, it's for the arbitrator to decide

 4    whether this is an ERISA plan, not for the Court to

 5    decide.

 6              THE COURT:  And you cite what case for that

 7    proposition?

 8              MR. SHAULSON:  My colleague is just grabbing

 9    that.

10              THE COURT:  Okay.

11              MR. SHAULSON:  So just one case, Your Honor,

12    you can refer to BP -- it's a Fifth Circuit decision,

13    2012.

14              THE COURT:  I like that.

15              MR. SHAULSON:  Makes it easy.  BP Explo --

16    sorry, BP Exploration Libya Limited versus ExxonMobil

17    Libya Limited.  The cite is 689 F.3d 481, 5th Circuit

18    2012.  And it says, in no way are Courts to consider the

19    merits of a claim.  And the merits here is a disputed

20    issue about whether this is an ERISA-governed plan or

21    not.

22              Another point that Plaintiffs made in

23    argument is that the LaVoice decision -- LaVoice versus

24    UBS -- did not involve a class action claim.  That's

25    just not true.  If Your Honor takes a look at that
```

 1   decision, it will be clear that the Plaintiffs were

 2   seeking to bring a class action on behalf of a class of

 3   financial advisors seeking overtime pay.  And the Court

 4   said, as it did in Cohen versus UBS, also a class

 5   action, that the FINRA rules -- under well-settled law,

 6   circuit law and district court case law, that FINRA

 7   rules can be overridden by a separate agreement per the

 8   terms of the FINRA rules themselves.

 9            Now, Plaintiffs' counsel keeps referring to

10   in their briefs and at argument this Nielsen case.  The

11   Nielsen case is totally different.  It didn't involve a

12   separate agreement with a class action waiver.  It was a

13   standard formulation of a U4 agreement incorporating --

14   I don't know if it was FINRA or NASD rules, but the

15   securities -- security exchange rules.  That case has no

16   application here whatsoever because there was no

17   separate agreement to agree to arbitrate claims on a

18   non-class basis.

19            THE COURT:  And what -- going back to your

20   separate agreement, that's the -- the Financial Advisor

21   Compensation Plan, and --

22            MR. SHAULSON:  So it's different for

23   different people because you have branch managers and

24   financial advisors, but it's basically the same

25   provision.

1          THE COURT:  And you're saying that this

2    document, the 25-page document that you've handed up, or

3    one very much like it, would be signed by each employee,

4    or at least each of the financial advisors who would be

5    Plaintiffs in this case?

6          MR. SHAULSON:  Correct.  Each Plaintiff

7    signed at least one arbitration provision with a class

8    action waiver.  Roccisano signed it five times.  Bollich

9    Cox, and Ellsper -- Ellspermann signed three times.

10   Eddingston and Galanis signed two times.  Davis and

11   Hendricks signed one time.

12          And the last agreement -- the last agreement

13   that went into effect for each one of the individuals

14   also contained a class action waiver.  And I'll tell you

15   which agreements those are.  For Eddingston and -- and

16   Hendricks, it's the 2008 Compensation Plan.  Davis and

17   Galanis, the 2009 Compensation Plan.  Bollich, the

18   January 2nd, 2009, FA Account Reassignment Agreement.

19   Cox, the 2010 Compensation Plan.  Ellspermann and

20   Roccisano, the 2011 Compensation Plan, as well as the

21   2011 PartnerPlus Plan.

22          So I just wanted to ask my colleague, Your

23   Honor -- I'll certainly ask -- answer any other

24   questions you have.  I wanted to ask my colleague to

25   address the questions about the injunctive relief

1    argument that Plaintiffs have made.

2              THE COURT:  All right.

3              MS. DAVIDSON:  Good afternoon, Your Honor.

4    Deborah Davidson, also on behalf of UBS.

5              THE COURT:  All right.

6              MS. DAVIDSON:  So the starting point in

7    looking at this question of the injunctive relief

8    carve-out is the very basic premise that any doubts

9    concerning the scope of arbitrable issues should be

10   resolved in favor of arbitration.  And that's under both

11   Supreme Court and Fifth Circuit case law.

12             And as you point -- and as Your Honor

13   pointed out when Mr. Stris was referring to the

14   injunctive relief carve-out that appeared in the 2007 FA

15   Compensation Agreement, there's actually different

16   language that appears in the various versions of the

17   comp plans.

18             And so, for example, between 2008 and 2010,

19   the comp agreements provided for -- with the exception

20   of claims for injunctive relief or the denial of

21   benefits under the firm's disability or medical plans.

22   Similar language appeared in the account reassignment

23   agreements for 2009.  Other agreements frame the

24   carve-out as injunctive relief under this letter of

25   understanding.  That's for the LOUs signed by Plaintiff

 1   Roccisano and Plaintiff Hendricks.  And then still

 2   others frame the carve-out as injunctive relief under

 3   this agreement, and that is the Account Reassignment

 4   Agreement signed by Mr. Bollich.

 5            So it's clear that there are different ways

 6   that the Court could look at what exactly is meant by

 7   this carve-out for injunctive relief.  One

 8   interpretation would be that -- that this carve-out

 9   applies only to claims either under this agreement with

10   respect to the account reassignment and the LOU

11   agreements, or for the 2008 going forward comp plans

12   that it would only be with respect to claims involving

13   medical or disability benefits.

14            THE COURT:  Can you articulate any reason

15   why it would have been limited to medical or disability

16   benefits?  I mean, is there some reason why that would

17   be a reasonable interpretation of the agreement?

18            MS. DAVIDSON:  Well, simply in -- in -- in

19   looking at how it -- how it's phrased.

20            THE COURT:  Well, I -- I see the words.  I'm

21   just wondering if -- if there's something about the

22   medical and disability plans that would make it more

23   logical to carve out a claim for injunctive relief.

24            MS. DAVIDSON:  Yeah, well -- well -- and,

25   Your Honor, I can't -- I can't answer that off the top

1  of my head without going back and -- and actually

2  reviewing the terms of the medical and disability

3  benefit plans that were in effect over time.

4          But even setting that aside, going back

5  again to this all doubts in favor of arbitration kind of

6  starting point, the carve-out for injunctive relief,

7  how -- you know, whichever of these phrasings you

8  choose, it's only a carve-out for claims for injunctive

9  relief.

10          But the arbitration agreement is actually

11  much broader than that.  It applies to any and all

12  disputes relating to employment, compensation, benefits,

13  whether statutory or otherwise, including under ERISA.

14  And as -- and as my -- my colleague, Mr. Shaulson,

15  explained, this is clearly a dispute involving benefits

16  compensation under the statute of ERISA, which is a

17  question for the arbitrator to decide.

18          What -- before you even get to the point of

19  what type of relief might ultimately be available if the

20  Plaintiffs were to prevail, there has to be a number of

21  findings made as to whether the plan was, in fact,

22  covered by ERISA, if it was, did it violate ERISA's

23  vesting and forfeiture provisions.  And then at the end

24  of the day, finally, there would be a determination as

25  to what the appropriate remedy would be.

1          And you have to take a step back and -- and
2    look at the -- look at the language in context.  You
3    know, especially considering the -- the any and all
4    language here -- excuse me.  You know, this is the type
5    of language that other Courts have found does not
6    override an otherwise very broad agreement to arbitrate
7    any and all claims like we have here, and I can give you
8    a few examples.
9          So, for example, in a Fifth Circuit
10   decision, Personal Security & Safety Systems versus
11   Motorola, it's 297 F.3d 388.  In that case, there was a
12   broad arbitration provision that covered an entire
13   contractual arrangement, but then there was also
14   language that gave -- that gave Texas courts exclusive
15   jurisdiction over any suit or proceeding.  And so the
16   Court had to look at whether that exclusive jurisdiction
17   language trumped the arbitration agreement, and it found
18   that it didn't.  It said, standing alone, one could
19   plausibly read the forum selection clause to mean that
20   Texas courts had the exclusive power to resolve all
21   disputes arising under the stock purchase agreement.
22   But the forum selection clause does not stand alone.
23   And the Court went on to go ahead and -- and find that
24   the claims were arbitrable.
25          And there is similar reasoning in the Comedy

```
 1   Club case that we cited in the briefing.  In that case,
 2   the arbitration agreement said that all disputes had to
 3   be resolved by arbitration, but then there was also a
 4   carve-out for equitable remedies, again, that would be
 5   subject to the exclusive jurisdiction of Courts.  And
 6   the Courts said, well, the exclusive jurisdiction for
 7   this equitable relief carve-out can't trump this
 8   otherwise very broad arbitration agreement because
 9   the Court has to resolve all doubts in favor of
10   arbitration.
11            THE COURT:  And is this the same case that
12   you're talking about that you started on, or is this a
13   different case that says that?  The -- the one you're
14   saying --
15            MS. DAVIDSON:  Oh, this is the -- the Comedy
16   Club case is cited in our -- yeah, it's a different case
17   than the Fifth Circuit case.
18            THE COURT:  All right.  And -- and what's
19   the cite on it?
20            MS. DAVIDSON:  It's 553 F.3d. 1277, and
21   that's a Ninth Circuit decision.
22            THE COURT:  Too bad.
23            MS. DAVIDSON:  That's why we cited the Fifth
24   Circuit case first, that's true.
25            You know, but also, Your Honor, if -- if
```

1   you -- if you go with Plaintiffs' interpretation and --

2   and find that simply dropping the word "injunction" in a

3   complaint is enough to take an -- an otherwise

4   arbitrable claim completely out of the scope of the

5   arbitration agreement, then the exception ends up

6   swallowing the rule.  And it would mean that anybody

7   who's filing suit would simply say, I want an

8   injunction.  I want an injunction to get a promotion.  I

9   want an injunction not to be discriminated against.  I

10  want an injunction to keep my job during a reduction in

11  force.  I want an injunction against offering certain

12  types of investments in my 401(k) plan.  I mean, you --

13  you get my drift.

14          Here, it's become very clear that what the

15  Plaintiffs are seeking to recover is the money.  It's

16  all about the money.  And the fact that they say that

17  they want an injunction -- first of all, as -- as I

18  mentioned earlier, you don't even get there because the

19  issues as to whether they can even establish that the

20  plan was governed by ERISA and that there was any ERISA

21  violation and that they would even be in a position to

22  seek any kind of relief, those are all questions for the

23  arbitrator.

24          But what they've also made clear is that

25  what they -- they -- what they want to happen is for the

1    plan document to be reformed so that they could be in a

2    position to get more money.  That's not an injunction,

3    Your Honor.  An injunction is something that is forward

4    looking to prevent against future harm.  These are

5    individuals who have all left UBS.  They've taken

6    complete distributions of their benefits under

7    PartnerPlus.  So the only way that they can be made

8    whole is to get a check for money.  That's not an

9    injunction.

10            THE COURT:  All right.  Ms. Davidson -- or

11   Mr. Shaulson, let me hear from -- from Plaintiffs'

12   counsel briefly, a response on that before we move on to

13   anything else.

14            Mr. Stris, why shouldn't the scope of that

15   arbitration clause and whether or not the -- the first

16   clause relating to injunctive relief affects the rest of

17   the clause, why shouldn't that be referred to an

18   arbitrator if the Court finds that this clause is the

19   effective clause?

20            MR. STRIS:  Well, I -- I guess the best way

21   I would answer that is that's just another way of asking

22   the question who gets to decide if ERISA applies?  And I

23   think the starting point is -- and we addressed this at

24   Page 4 to 5 of our opposition in Footnote 3.  We're

25   either dealing with a motion to dismiss here or we're

1   dealing with something that has a summary judgment

2   standard.  So let me -- let me walk through the

3   procedures.

4             If what we're dealing with is a motion to

5   dismiss, we cite the Monarch Flight case and the Taylor

6   case for the fact that you -- you accept our allegation

7   that this is an ERISA plan.

8             THE COURT:  Well, we're not really dealing

9   with a motion to dismiss or a motion for summary

10  judgment.  We're dealing with a motion to compel

11  arbitration.

12            MR. STRIS:  But there has to be a procedural

13  standard by which we determine who has the burden of

14  proof, who gets to decide what.

15            So let me go directly to the issue of who

16  gets to decide, the Court or the arbitrator.  My

17  colleagues cite you to this Fifth Circuit case, the --

18  the Libya case.  Well, I would point more directly to

19  another case they cite.  It's a 1986 Supreme Court

20  case, the AT&T case.  It's on Page 16 of 29 of their

21  papers.

22            THE COURT:  Uh-huh.

23            MR. STRIS:  It makes very clear that a

24  question such as is this an ERISA-governed plan, that

25  needs to be decided by the Court.  That's not -- that's

```
 1   not an issue of the merits, and you really need to look

 2   no further than the seminal Granite Rock case, another

 3   Supreme Court case, 2010, we cite it on Page 14 of our

 4   agreement.  And, basically, what the Court held there is

 5   that --

 6            THE COURT:  I'm not really on whether or not

 7   this is an ERISA-governed plan because this arbitration

 8   clause that we're talking about now that's in the

 9   Financial Advisor Compensation Plan, nobody contends is

10   in an ERISA plan, right?

11            MR. STRIS:  That's right.

12            THE COURT:  It's just a question of does it

13   govern the claims that you're asserting here.

14            MR. STRIS:  Well, we -- I would submit that

15   we only get there if you've rejected our earlier

16   argument that under ERISA, we have to look at the -- the

17   language in the PartnerPlus Plan.

18            THE COURT:  Well, you've not been able to

19   cite me any case that -- that addresses whether a

20   general arbitration agreement by an employee can affect

21   that.  I understand because you don't believe it's ever

22   been tried before.

23            MR. STRIS:  I was hoping to speak to that

24   issue because I think it's going to be critical in

25   resolving this -- the -- this issue.
```

1              THE COURT:  Are you familiar with this

2     Brandl case?

3              MR. STRIS:  I -- I am sufficiently familiar

4     with the cases cited and the argument made by my

5     colleagues that I -- I think I have a very direct

6     response which is this.

7              THE COURT:  Okay.

8              MR. STRIS:  The question is, when do

9     separate agreements trump an ERISA plan?  That's the

10    question.  And I want to be very clear here.  My

11    argument is not that you can have -- you can't have a

12    separate agreement to arbitrate.  That is not my -- my

13    position.

14             My position is that this is a unique case

15    where the pension plan has an arbitration provision.  If

16    you accept my argument that that provision governs, then

17    you're in black letter ERISA law.  And under black

18    letter ERISA law -- this comes right out of the statute,

19    29 U.S.C. 1024 -- you cannot materially modify any

20    provision in the ERISA plan.  It doesn't matter if it's

21    arbitration, if it's the way you calculate your benefit,

22    unless you comply with specific rules.

23             So every case that UBS has cited to you is

24    irrelevant.  In fact, they -- they told you the one case

25    that they -- they most heavily relied on, there was no

1   arbitration provision in the pension plan.  That's not

2   this case.  See, I feel like it's partially my fault.

3   We're getting away from sort of what the core -- in my

4   view, what the core issue is here.

5           We have a pension case.  We have a dispute

6   about a pension plan.  The pension plan has an

7   arbitration provision that UBS can't get up here and

8   credibly argue applies to this case because it carves

9   out class actions.  So we've spent a lot of time today

10  talking about other issues, but really at the end of the

11  day, we only get to those issues if for some reason

12  we're not interpreting the arbitration provision in the

13  pension plan in a pension case.

14          And I don't think any argument about how,

15  well, there's a -- there's a -- you need to err on the

16  side of -- of favoring arbitration --

17          THE COURT:  I think the concise answer to my

18  question would be you say the Brandl case is

19  distinguishable because the pension plan in that case

20  did not have an arbitration agreement.

21          MR. STRIS:  Yes, I --

22          THE COURT:  Okay.

23          MR. STRIS:  I -- and I would -- I would go a

24  step further.  I'll try and be concise.  I believe UBS

25  has not cited a single case where there is a pension

1   plan that had an arbitration provision that permitted

2   the case to proceed in court that was then trumped by an

3   outside agreement.

4           And that's critical because my argument only

5   kicks in when you're trying to use an external document

6   to change the pension plan.

7           THE COURT:  Okay.

8           MR. STRIS:  And that's why I can't give you

9   a case because I wasn't trying to be -- be -- you know,

10  slick.  I've never seen a situation, and I've never -- I

11  read a lot of cases.  I've never read a case where

12  someone has tried to use another document to get around

13  the pension plan.

14          That's the point I was trying to make about

15  LaVoice and Cohen and Lewis in -- not -- UBS has not

16  responded to the fact that in none of those cases was

17  the -- was the PartnerPlus Plan involved.  In none of

18  those cases was the arbitration provision that we rely

19  on put before the Court.  In none of those cases did the

20  Plaintiff argue, hey, we get to proceed with our class

21  action because there's a provision here that exempts

22  class actions.

23          And there's a simple reason for that.  There

24  was no provision that exempted class actions in those

25  cases because they weren't pension cases.

 1              THE COURT:  Okay.  Well, then let me hear

 2    from them on that.  Thank you.  You've helped focus my

 3    understanding of your argument.

 4              MR. SHAULSON:  Your Honor, first of all,

 5    these are two separate agreements, as we've gone over,

 6    and you can have an agreement to arbitrate ERISA and

 7    pension plan claims outside of an ERISA plan.

 8              THE COURT:  Well, but the question is, can

 9    it modify the arbitration provision within the ERISA

10    plan?

11              MR. SHAULSON:  Right.  Now, let me -- let me

12    answer that.  The -- according to the Courts,

13    arbitration agreements need to be read harmoniously

14    with one another.  Let me just get you a -- let me just

15    get -- I'm going to --

16              THE COURT:  I think that's true of all

17    agreements, but --

18              MR. SHAULSON:  Right.  So now you have a

19    PartnerPlus Plan, and let -- I'll indulge counsel for a

20    second in saying, assume it's an ERISA plan, which,

21    again, I think is an issue for the arbitrator to decide.

22    It goes to the merits.  The issue about summary

23    judgment, motion to dismiss, those are disputed issues

24    of fact.  This is a question of -- of law, a dispute of

25    law.  The arbitrator is to decide disputed issues of law

1   when the parties have agreed to arbitrate.

2            In any event, the arbitration agreement

3   contained in the PartnerPlus Plan, there's no dispute

4   that it incorporates FINRA rules.  The FINRA rules

5   specifically allow a separate agreement.  So there is no

6   conflict between the -- what they'll say is an

7   ERISA-governed plan, the PartnerPlus, and the FA

8   Compensation Plan, because the PartnerPlus Plan

9   specifically incorporates a rule that says can have a

10   separate agreement.  And the PartnerPlus Plan doesn't

11   say you can bring a class action.  It absolutely doesn't

12   say that.  All it says is we're going to incorporate

13   FINRA rules.

14            Now, what do FINRA rules say?  FINRA rules

15   say, ordinarily -- ordinarily, we're not going to hear

16   class claims, and, ordinarily, you may have a right to

17   go to Court to bring a class claim, but you can have a

18   separate agreement in which you agree not to have class

19   claims.

20            THE COURT:  Now, we're not here on the

21   question of whether or not their class claim should be

22   dismissed.

23            MR. SHAULSON:  Correct.

24            THE COURT:  And that -- that's a matter that

25   you could bring up by whatever means you want.  We're

1    just here on the matter of should their claims be

2    compelled to arbitration and on -- so the -- the meaning

3    of that arbitration clause which incorporates FINRA is

4    what I'm looking at.

5                    MR. SHAULSON:  Right.

6                    THE COURT:  And that arbitration clause, if

7    it incorporates FINRA, doesn't extend to class claims,

8    right?

9                    MR. SHAULSON:  No, it says -- specifically

10   with respect to class claims, Rule 13204.  It has a

11   savings provision, and the savings provision

12   specifically says that you can have a separate

13   arbitration agreement.

14                   THE COURT:  Throw -- throw that 13204 up on

15   the ELMO --

16                   MR. SHAULSON:  Sure.

17                   THE COURT:  -- and let's -- let's look at

18   that.

19                   MR. SHAULSON:  Sure, Your Honor.

20                   So just -- just -- am I doing this wrong

21   here?  There we go.

22                   So, basically, in A, it says, class claims

23   may not be arbitrated under the code.  And then it

24   said -- you know, talks about what a class claim is.

25   But the key provision is on the next page.  You tell me

```
 1   when you want me --
 2              THE COURT:  Go ahead.
 3              MR. SHAULSON:  -- to flip it.  So this is
 4   your savings clause at the end -- sorry, I did it again.
 5   I underlined it.  These par -- these subparagraphs,
 6   being the subparagraphs of 13204, do not otherwise
 7   affect the enforceability of any rights under the code
 8   or any other agreement.
 9              Now, there's also another provision here,
10   and I'll -- I'm just going to go back to -- it says in
11   4, 13204(a)(4), and it talks about how you can't enforce
12   an arbitration agreement until -- and then on the next
13   page it says, the last bullet -- the member of the
14   certified or putative class elects not to participate in
15   the class.
16              So we're not writing on a blank slate here,
17   Your Honor.  We've had multiple Courts opine on this
18   very issue, including three with respect to UBS's FA
19   Comp Plan.  And in each case, the Court has said that
20   what this clause means is that you can have a separate
21   agreement in addition to the FINRA rules, and that that
22   agreement is enforceable.
23              And so the Cohen, the LaVoice Courts, the
24   Lewis Court have all concluded that notwithstanding an
25   agreement to incorporate FINRA rules, it is entirely
```

1    consistent with that other agreement and consistent with

2    the FINRA rules to have an arbitration agreement which

3    has a class action waiver in it.

4           And so even if you accept Plaintiffs'

5    counsel's argument, there is no conflict between the

6    SPD, which doesn't expressly preclude class actions, and

7    the FA Compensation Plan.

8           THE COURT:  Well, what about Nielsen and the

9    Citigroup case?

10          MR. SHAULSON:  Sure, Your Honor.  First of

11   all, Citigroup is a case about waiver.  It's a case in

12   which the Defendant, I believe, didn't move to compel

13   arbitration until 18 months after the litigation began,

14   after class certification had already been granted, and

15   the Court simply considered whether Citigroup had waived

16   the right to compel arbitration and concluded that it

17   had.

18          The Nielsen case is a case in which they

19   incorporate the security industry rules, and there's no

20   separate agreement to waive class action claims.  That

21   is completely unlike Lewis, Cohen, LaVoice, the Suschil

22   case from the Northern District of Ohio.  It's

23   completely unlike the Second Circuit's decision in

24   Merrill Lynch versus Georgiadis, Credit Suisse versus

25   Pitofsky, the Chanchani case from the Southern District

1   of New York.  Every case that has ever considered this

2   issue has said that when you consider an incorporation

3   of FINRA rules in one agreement, if you have another

4   agreement that says you're going to have a class action

5   waiver or otherwise modify FINRA rules, it's entirely

6   enforceable, because that's what the rules say.

7            THE COURT:  Well, the -- it's hard for me to

8   go with your analysis of that Citigroup case.  While

9   admittedly the case is about waiver, it goes on to say

10  that under the NASD rules, claims submitted for -- as a

11  class action shall not be eligible for arbitration, nor

12  may a member enforce agreement, neither Lomas himself or

13  those class members subject to NASD rules could be

14  compelled to arbitrate.

15           MR. SHAULSON:  Right.  But that -- again,

16  there's no separate agreement to arbitrate on a

17  non-class basis.

18           THE COURT:  Well --

19           MR. SHAULSON:  And by the way, I'm -- I'm

20  very familiar with that Citigroup Plan.  The Citigroup

21  Plan basically says -- which was not at issue because

22  they have a different plan that specifically says you

23  can't bring class action claims.  This was before the

24  amendment of that plan.  That is completely

25  distinguishable for the same reason that Nielsen is

1    distinguishable.  There was no separate agreement to

2    arbitrate on a non-class basis, which is the case here.

3            And if we look at the -- if you looked at

4    the Cohen decision, you know, the -- the Court goes

5    through it in painstaking detail.  It says, number

6    one -- and it actually says it this way.  Number one,

7    this Court has to recognize that you can enter into

8    additional arbitration agreements beyond the scope of

9    the code, meaning the industry code in the -- in the

10    FINRA rules.  Then it says, number two, the code is not

11    affected by the enforceability of these additional

12    contracts.  Moreover, the -- it -- it says the financial

13    advisors elected not to participate in a class action.

14    Once you elect not to participate in a class action, as

15    they did here -- as the Plaintiffs did here by agreeing

16    to arbitrate on a non-class basis, you can go to FINRA

17    on an individual basis and 13204 is no barred.

18            And by the way, this isn't -- this isn't --

19    not only is the case law universal, Plaintiffs in the

20    Hendricks brief -- and I could find you the cite in the

21    Eddingston brief, as well, but on Page 16 of the

22    Hendricks opposition, Plaintiffs specifically say, you

23    can do this.  In fact, they say, it's not hard for UBS

24    to do this.  All they have to do is draft a provision

25    with a class action waiver.  Well, that's exactly what

1   UBS did.

2           THE COURT:  I see what you're

3   talking about --

4           MR. SHAULSON:  Your Honor, just --

5           THE COURT:  -- in the ERISA plan, but...

6           MR. SHAULSON:  Yeah, but, again -- again,

7   their -- their argument -- if you accept their argument,

8   and we do not because, number one, it's not an ERISA

9   plan.  It's a question for the arbitrator as to whether

10  it is an ERISA plan.  Number two, they're making the

11  argument about modifying an ERISA plan.  No one is

12  arguing -- there is no argument by UBS that we are

13  modifying an ERISA plan.  These are two separate

14  stand-alone agreements, as Your Honor indicated before,

15  two separate stand-alone agreements that can stand by

16  themselves.  And there's no prohibition on an individual

17  agreement to arbitrate -- to arbitrate claims for

18  benefits or ERISA claims.

19          Number three, Your Honor, even if their

20  argument were correct -- even if their argument were

21  correct that ERISA has some rule that would prevent you

22  from having a separate arbitration agreement, we're not

23  writing on simply a blank slate of ERISA claims.  We

24  also have the Federal Arbitration Act to contend with

25  here, too.  And the Federal Arbitration Act trumps

1   ERISA.   The Federal Arbitration Act says that you have

2   to enforce the arbitration agreement according to its

3   terms.

4              Moreover, Your Honor, the Fifth Circuit,

5   picking up on Supreme Court authority, very well settled

6   Supreme Court authority, said in the Webb versus

7   Investacorp case -- and I'll get you the cite for

8   that -- in Webb versus Investacorp, Inc., 89 F.3d 252,

9   1996 decision from the Fifth Circuit, said, if it's

10  been established that there is an arbitration

11  agreement -- which there clearly has, there's no dispute

12  that there's an arbitration agreement at play here --

13  any ambiguities -- any ambiguities on the scope of the

14  arbitration clause, quote, must be resolved in favor of

15  arbitration, end quote.

16             And the standard here is that unless it can

17  be said with positive assurance that the agreements are

18  not susceptible to an interpretation favoring an

19  arbitration, then the arbitration agreement needs to be

20  enforced, favoring arbitration.   And it's Plaintiffs'

21  burden to prove that there's not positive assurance.

22             THE COURT:   What is the gist of your

23  argument that the PartnerPlus agreement is not covered

24  by ERISA?

25             MS. DAVIDSON:   And, again, Your Honor, I say

```
 1    this with the -- the starting point that we believe this

 2    is an issue for the arbitrator to decide, but the

 3    question that the arbitrator will face is -- is this a

 4    pension plan or is it another type of plan that doesn't

 5    fall within the bucket of pension plan under ERISA.  So

 6    to be a pension plan under ERISA, it has to be a plan

 7    that is designed to provide retirement income.

 8              A PartnerPlus Plan is not designed to

 9    provide retirement income.  It's a deferred compensation

10    plan to reward financial -- excuse me -- to reward

11    financial advisors and branch managers in terms of

12    compensation.  It's deferred, but it's not deferred

13    until retirement.

14              And, in fact, over time, the plan has

15    required that participants begin taking distributions of

16    their benefits while still employed.  And that's very

17    different from a pension plan where the benefits by

18    their very design do not even kick in until someone is

19    terminating employment and getting to retirement age.

20    So that's the gist of it.  It's -- it's a bonus plan.

21    It is not a retirement plan.  It's not designed to

22    provide retirement income.

23              THE COURT:  And has its status, as covered

24    by ERISA or not, been litigated before other Courts?

25              MS. DAVIDSON:  No.
```

1                    THE COURT:  Has it been subjected to

2      arbitration?

3                    MS. DAVIDSON:  There are other claims

4      involving PartnerPlus that are pending, but there --

5      there's been no decision.

6                    (Discussion off the record between Defense

7      counsel.)

8                    MS. DAVIDSON:  Oh, that's true.  Well, the

9      Thaning case, Thaning versus PaineWebber UBS, that also

10     involved the PartnerPlus Plan, and that's a -- a claim

11     that was compelled to arbitration.

12                   THE COURT:  And was there any decision about

13     whether or not it was an ERISA plan?

14                   MS. DAVIDSON:  Not by the Court, and I --

15     I'm not aware of what, if any, decisions were made by

16     the arbitration panel, but that -- that claim did not

17     challenge the plan as an ERISA plan.

18                   THE COURT:  All right.  Thank you.

19                   What do you say, Mr. Stris, to the argument

20     that the execution by your clients of the -- I'll call

21     it waiver of class action participation, but in any

22     event, the language in that Financial Advisor

23     Compensation Plan that we've talked about, what do you

24     say to the argument that that kicks in this provision of

25     FINRA that the member has elected not to participate in

1    a class action?

2              MR. STRIS:  Yeah.  So I think now we're

3    getting to sort of the heart of -- of where I was trying

4    to start earlier because I think this issue stops us

5    from being ships -- us and UBS from being ships passing

6    in the night.  Here's how -- here's how I would conceive

7    of it.

8              UBS tells you, you can have a separate

9    agreement that overrides FINRA for these various reasons

10   you just mentioned.  They also tell you, and I don't

11   disagree, you can have a separate agreement that changes

12   a pension plan.  Neither of those things are relevant

13   here because the separate agreement has to be valid.  It

14   has to be binding.

15             And so my answer to your question is very

16   straightforward, and this is why I focus so much on

17   why this is an ERISA case.  Under ERISA, if you start

18   with a pension plan, like the PartnerPlus Plan, that

19   says, we are incorporating FINRA's rules.  You are

20   permitted to bring a class in court.  And let's be

21   clear, that's what the Niel -- the Nielsen case and

22   the -- the First Circuit case say.  The language is

23   almost exactly the same, and the Seventh Circuit said,

24   it expressly prohibited the Defendants from getting that

25   class action out of court.

 1                If that's your starting point, and we submit

 2     it is, then it takes a heck of a lot to contract around

 3     that.  And if you're dealing with an ERISA plan, and I

 4     still haven't heard a response from my -- from my

 5     colleagues here, that means you're trying to modify the

 6     plan.  And I've heard nothing.  29 U.S.C. 1024 says,

 7     when you modify a plan, you must comply with strict

 8     requirements.  They haven't even gotten up here and said

 9     they've complied with those requirements.  So FINRA

10     doesn't get you around the ERISA problem.

11                Now, if you --

12                THE COURT:  All right.  Let me -- let me

13     just -- I don't know that you really addressed this.

14                MR. STRIS:  Okay.

15                THE COURT:  If -- if FINRA says, class

16     claims can be submitted to arbitration once the member

17     elects not to participate --

18                MR. STRIS:  I see where you're going.

19                THE COURT:  -- then how does it violate the

20     PartnerPlus arbitration clause --

21                MR. STRIS:  Yeah.

22                THE COURT:  -- to submit this to

23     arbitration?

24                MR. STRIS:  Here's why.  The -- all of our

25     clients and all members of the class were parties to the

1    PartnerPlus Plan.  And they were told, including in the

2    summary document, hey, go look at the plan documents.

3    They're available on the extranet.  Check them out.

4    They govern.

5              If anyone, myself, any of my clients went

6    and looked at that agreement, they would see language

7    that says, essentially, you have to arbitrate

8    everything, except for a class action.  And they thought

9    that that's what governed, just like in the Nielsen

10   case.

11             So when they executed this separate

12   document, it was not their intent -- especially when the

13   document says if there's any conflict, the plan

14   governs -- to give up those rights.

15             Now, you don't have to take my word for it,

16   and you don't have to indulge in presumptions because

17   ERISA provides very specific requirements to protect

18   against this very thing from happening.  It says, if you

19   want to change what you've told people are their rights

20   in the pension plan, you need to -- you need to do it in

21   writing, you need to do it in a way that an average

22   person can understand --

23             THE COURT:  Well, let me -- I'm familiar

24   with that jurisprudence.  But the PartnerPlus Plan

25   doesn't say anything about class actions in the

```
 1   arbitration clause.
 2                  MR. STRIS:  Well, I --
 3                  THE COURT:  It just incorporates FINRA,
 4   right?
 5                  MR. STRIS:  Yeah, but I don't think I would
 6   agree with that characterization because -- can I look
 7   at -- can I -- can I walk -- walk you through the
 8   language?
 9                  THE COURT:  Sure.
10                  MR. STRIS:  What it says, and I'm going to
11   quote, is claims, quote, shall be resolved before an
12   NASD arbitration panel in accordance with the
13   arbitration rules of the NASD.
14                  Now -- and it was later changed to FINRA.
15   Now, if we look at the FINRA rules, they say two things.
16   They say, FINRA won't permit an arbitration of claims
17   when a class action is pending.  And, secondly, and more
18   importantly, they say, a party isn't able to enforce an
19   arbitration provision that relates to pending class
20   claims.
21                  THE COURT:  And it goes on to say, until,
22   right?
23                  MR. STRIS:  That's right.
24                  THE COURT:  Until the member elects not to
25   participate.
```

1          MR. STRIS:  And so now we get to the $64

2    million question, which is, did my clients elect not to

3    participate by -- and I guess UBS's argument would be

4    signing the -- what I call the summary brochure.

5          And I think there's a simple answer, which

6    is under ERISA, that can't count.  That's not good

7    enough.  The whole jurisprudence of waiver is under

8    ERISA, and ERISA is very protective.  It says, if you're

9    going to waive rights that you have in the plan

10   document, it has to be done in a very specific way.

11         So I don't care what FINRA says.  FINRA can

12   say, this doesn't eclipse other agreements, but if I

13   hold a gun to someone's head and say, sign this

14   agreement, obviously, that's an agreement that's --

15   that's procured under duress.  UBS couldn't come into

16   Court and say, oh, but FINRA says, this doesn't

17   affect -- this is eclipsed by other agreements.  It has

18   to be another valid and binding agreement.

19         So, essentially, their -- they -- their

20   argument begs the question, it totally fails to respond

21   to -- to our critical position, which is that agreement

22   isn't an enforceable agreement.  And that's why they

23   make such a big deal of the fact that this is not an

24   ERISA case and that the arbitrator has to decide.  And

25   so --

 1              MR. GOODMAN:  Your Honor, may I call

 2    Mr. Stris' attention to one thing?

 3              THE COURT:  Go ahead.

 4              MR. GOODMAN:  Your Honor, with respect to

 5    the specific language that you've referred to, the

 6    member of the certified or putative class elects not to

 7    participate, that clearly relates to an opt-out because

 8    it involves judicial involvement.  It says, which elects

 9    not to participate in the class or withdraws from the

10    class according to conditions set by the Court.  It is

11    not a reference to any separate agreement.  By its very

12    terms, they reference to an opt-out subject to

13    conditions set by the Court, which is certainly what the

14    Court has authority to impose under Rule 23 when a class

15    action goes forward.

16              And so this claim language simply does not

17    allow for enforcement of a separate agreement distinct

18    from the argument that the -- there's a -- a governing

19    plan that doesn't permit enforcement of any contrary

20    document.  That language does not do it.  It's --

21    it's incorporation, if anything, of Rule 23, opt-out

22    provisions.

23              THE COURT:  All right.  Is -- it -- it was

24    my understanding that UBS is contending that some Courts

25    have relied upon that as an answer to the limitation of

1   the arbitration clause to FINRA rules.  Is -- is that --

2   am I understanding that -- your position right,

3   Mr. Shaulson?

4           MR. SHAULSON:  Yes, Your Honor.

5           THE COURT:  And which case would that be

6   that you would point to, or cases?

7           MR. SHAULSON:  Sure.  So there's several,

8   Your Honor.  There's the U -- there's the LaVoice versus

9   UBS case.

10           (Discussion off the record.)

11           MR. SHAULSON:  There's the LaVoice versus

12   UBS case.  There's the Cohen versus UBS case.

13           THE COURT:  And -- and do those specifically

14   refer to this provision of FINRA adopting a -- a waiver

15   of class action claims?

16           MR. SHAULSON:  The -- the Cohen case, I'm

17   sure, does.  That's the case that I referred to earlier

18   that went through the one and the two.  So the Cohen

19   case both referred to the savings clause at the end,

20   doesn't affect the enforceability of rights under the

21   code or any other agreement, and also referred to the

22   election.  So -- I forget your -- your name, sir.

23           MR. GOODMAN:  Goodman.

24           MR. SHAULSON:  Goodman.

25           So Mr. Goodman referred to the election

1   provision, but didn't address the savings provision at

2   the end about a separate agreement.  I'll also add that

3   the Suschil court from the Northern District of Ohio

4   also specifically addressed that savings provision in

5   the context of a class action waiver.

6           And I believe Lewis -- Lewis versus UBS also

7   enforced the class action waiver notwithstanding the U4

8   rules.

9           Now, with respect to the election language

10  that Mr. Goodman referred to, it says, the member of the

11  certified or putative class elects not to participate in

12  the class, which is different than withdraw from the

13  class according to conditions set by the Court.

14          So you can make an election.  If -- if that

15  only meant withdrawn according to conditions by the

16  Court, opting out, then they wouldn't need to say both

17  of those things.  Those are two different things.  One

18  is withdrawing from the class according to conditions by

19  the Court, i.e., opting out.  The first is electing not

20  to participate.

21          If I tell a Court -- if I tell the Court,

22  Judge, I'm not participate -- a purported class action

23  such as this is filed, no certification decision or what

24  have you, if I'm a class member and I say to the Court,

25  I'm -- I'm not participating in this.  I already signed

1 an agreement electing not to participate.  That's an

2 election not to participate.  You don't need conditions

3 by the Court or what have you.  No one can be compelled

4 to, you know, participate in the class action.

5           The other thing that -- the other thing

6 that -- that I want to address is we're not just looking

7 at -- we're not just looking at contractual provisions.

8 We're looking at contractual provisions against the

9 backdrop of the Federal Arbitration Act.  So we need to

10 look at the FAA and the embodiment of a policy in favor

11 of arbitration so that all doubts get resolved in favor

12 of arbitration.

13           What counsel was arguing is a very circular

14 argument that you've incorporated FINRA rules.  We're

15 going to ignore FINRA rules.  And you can't -- you can't

16 have the FINRA rules because the SP -- because the

17 PartnerPlus Plan says something else.  I don't get it.

18 The PartnerPlus arbitration provision says, we're

19 incorporating FINRA rules.

20           Now, if the financial advisor or branch

21 manager went to the arbitration provision of the

22 PartnerPlus Plan, they would see that it says, subject

23 to exhaustion -- we'll put that aside -- in the event of

24 any dispute, claim, or controversy involving a

25 claimant -- and I'll put this on the screen so Your

 1   Honor can see it -- I'm sorry, were you -- were you done

 2   looking at that?

 3           THE COURT:  No, go ahead.  That's fine.

 4           MR. SHAULSON:  Sorry.  So it says, in the

 5   event of any dispute, claim, or controversy involving a

 6   claimant and the plan and the sponsor, involving a

 7   claimant, if anybody read that language, they would

 8   presume that that is an individual claim by the claimant

 9   and the plan.

10           Now, if you went -- if the person actually

11   went to the incorporated FINRA rules, they would see

12   what we saw before.  Number one, there are exceptions to

13   the rule, when you make an election and other agreements

14   are enforceable.

15           Now, I'll point out -- this is not a retail

16   clerk that we're talking about here or, you know,

17   some -- some person who hasn't -- hasn't, you know,

18   advised clients about millions and millions of dollars

19   of investable income.  These are people who made

20   hundreds and hundreds and hundreds, some of them

21   $800,000.00 a year, they made from UBS.  These are not

22   unsophisticated individuals.

23           As Marsh versus Prudential pointed out, the

24   New York Court of Appeal, financial advisors are very

25   sophisticated individuals.  And there's a slew of case

1    law -- I can't cite it to you today, but there's a slew

2    of case law that contracts, that incorporate by

3    reference are valid and enforceable and individuals are

4    presumed to know the agreements that they agreed to.

5              THE COURT:  All right.  We're going to take

6    a brief recess now, and we'll be back in 15 minutes,

7    3:30.  Thank you.

8              MR. SHAULSON:  Thank you, Your Honor.

9              (Recess.)

10             LAW CLERK:  All rise.

11             THE COURT:  Good afternoon.  Please be

12   seated.

13             Having carefully considered the briefs and

14   exhibits filed in this matter and the extensive oral

15   argument that we've heard today and being mindful of the

16   policy of the Federal Arbitration Act in favor of

17   arbitration, that only where the terms of the

18   arbitration clause call for it, I find that the

19   arbitration clause in the PartnerPlus Plan clearly does

20   not extend to arbitration of class claims.

21             I further find that the language of the

22   FINRA rule, which I believe is 13240, which has language

23   accepting class claims where the member elects not to

24   participate, does not apply here.  Pre-suit waiver

25   clause, such as that relied upon in the Financial

1    Advisor Compensation Plan does not fall within the

2    language of that FINRA rule which contemplates election

3    not to participate in or withdrawal from a pending

4    certified or putative class action claim.

5              Therefore, I find that the PartnerPlus

6    arbitration clause does not provide for arbitration

7    of the claims that the Plaintiffs are making in this

8    case.

9              The Court will accept the PartnerPlus Plan

10   as a covered ERISA plan at this time, based upon the

11   allegations of the complaint and the first amended

12   complaint and also based on the fact that it appears,

13   based on a reading of those plans, to meet the

14   definition of a pension plan or a deferred compensation

15   plan that would be covered by ERISA.

16             Whether or not it actually is such a plan is

17   a matter that will have to be determined at a later

18   date.  But because the Court accepts it as such at this

19   time, as I believe the Court has to on this record, the

20   separate arbitration agreement in the Financial Advisor

21   Compensation Plan will not be allowed to modify the

22   arbitration clause in the PartnerPlus Plan under ERISA.

23   And to give it the effect that the Defendant, UBS, is

24   arguing for in this case would be to modify that plan.

25             Accordingly, the Court will proceed with the

1   case to the stage involving class certification.  The

2   Defendant may at the same time present the motion for

3   summary judgment, if it believes it can support one, on

4   the matter of ERISA coverage, which, if successful,

5   could result in a reconsideration of this ruling.

6            Also, obviously, if the class is not

7   certified, then the FINRA rules would allow for

8   compelling arbitration of the individual claims through

9   the PartnerPlus Plan.

10            I'll -- I will accordingly proceed to the

11   question of the schedule which has been addressed by

12   both sides in their Rule 26(f) submissions.  At this

13   point, my intention is simply to schedule the matter

14   through a class certification hearing.  If the class is

15   certified, then we'll take up the timeline to trial of

16   the class claims.  If it's not certified, then we'll

17   proceed along a different route.

18            I think it's incumbent upon the Plaintiffs

19   to file a motion for class certification as soon as

20   possible, and I -- in the submission, the joint

21   submission, the suggestion was made that the motion

22   itself could not be filed until -- let's see, 120 days

23   from now.

24            Is there any reason why such a lengthy

25   delay is necessary to file the motion for class

 1   certification?

 2              MR. GOODMAN:  Your Honor, the only reason

 3   could be the necessity for some class discovery, and

 4   what -- what may make sense is for the parties to confer

 5   about a period not longer than that and see if we can

 6   come to a joint recommendation in the next few days to

 7   the Court about a set of deadlines that relates to class

 8   certification and discovery and if there are expert

 9   witnesses for that on class certification and such, in

10   other words, try to restate the class

11   certification-related deadlines for the Court's

12   consideration.  That's one approach.

13              I think that we'd probably like to discuss

14   among ourselves what scope of class discovery is

15   appropriate, which would, to me, be the only condition

16   that would bear on whether we could do it sooner than

17   120 days.

18              THE COURT:  What sort of discovery are

19   you planning on seeking before the certification

20   hearing?

21              MR. GOODMAN:  Your Honor, if the issue of --

22   for example, of whether it's an ERISA plan and it's

23   certainly a unitary plan and the contention is that its

24   provisions are illegal as to hundreds if not thousands

25   of individuals, if there is a question about ERISA

```
 1   coverage -- that under the applicable law, in fact,
 2   under the statute is very clearly -- has some facts
 3   bearing on it.  To the extent there are contentions that
 4   there is any individualized treatment necessary,
 5   notwithstanding this one plan, one set of provisions,
 6   one claim of illegality, then there may be a need to
 7   test that opposition by some limited discovery
 8   depositions of human resource representative, et cetera.
 9   Those are the kinds of questions, I think, that would
10   bear on the certification issue.
11           THE COURT:  Well, that in my mind is all the
12   more reason to get your motion filed early.  That --
13   what the points of dispute are between the parties as
14   to Rule 23 won't really be focused until you've filed
15   your motion and they've filed their response.  And if
16   there are fact issues that need to be resolved to
17   present those disputes to the Court at the
18   certification hearing, then -- then at least we'd know
19   why discovery was needed.  But until they see your
20   motion and you see their response, I don't understand
21   how you're going to go about determining what's in
22   dispute.
23           MR. GOODMAN:  I -- I appreciate what the
24   Court has said, and it may be that the motion could be
25   filed, the opposition could be filed, and the Court can
```

1  permit discovery prior to the final hearing with

2  supplemental papers to be filed based on any discovery

3  document or otherwise that's taken.  That's -- that

4  certainly seems sensible.  I agree with the Court that

5  that will be the best way to -- to flag any issues that

6  exist.

7           Counsel at this table can confer for a few

8  minutes and perhaps say more, but I certainly don't have

9  a problem with the Court's suggestion that some final

10 hearing would await whatever appropriate identification

11 of issues in discovery occurred for some period of 30,

12 60, 90 days, that kind of thing.

13          THE COURT:  Well, I -- what I'll do is

14 I'm -- I'll take another break in a minute and let y'all

15 confer, but what -- what I think needs to be established

16 is a date as soon as possible for you to file your

17 motion, 30 days or so for the Defendants to file their

18 response, a date for both sides to provide lists of

19 witnesses and experts who they intend to call at a

20 hearing, and -- and then a hearing date.  And I would

21 think that it can be done with a minimum of discovery.

22 I mean, these issues are not supposed to be on the

23 merits.

24          MR. GOODMAN:  Your Honor, you may be -- it

25 may end up being perfectly true that there are very

1    limited or -- or no issues that are -- that require that

2    kind of discovery, but we'll confer about that and come

3    up with something that probably looks very much like

4    what you just suggested.

5              THE COURT:  All right.  And --

6              MR. GOODMAN:  We'll confer with the other

7    side, as well.

8              THE COURT:  And I understand -- I'll just

9    note for the record, I understand that Defendant's

10   participation in this scheduling effort is by no means a

11   waiver of your rights to object to the ruling on the

12   motion to compel arbitration.

13             But we'll take a brief recess to allow you

14   to confer about a schedule.  Thank you.

15             MR. GOODMAN:  Thank you.

16             LAW CLERK:  All rise.

17             (Recess.)

18             LAW CLERK:  All rise.

19             THE COURT:  Thank you.  Please be seated.

20             I understand that counsel have had a chance

21   to confer about a schedule for the certification hearing

22   which would involve the filing of the Plaintiffs' motion

23   for certification within 30 days --

24             MR. GOODMAN:  Yes.

25             THE COURT:  -- from today?  And the

1    Defendant's response after a like period, 60 days from

2    today; is that right?

3            MS. DAVIDSON:  Actually, Your Honor -- well,

4    first, you know, just as -- as you've explained that

5    we're not waiving any objections that we may have to

6    your ruling by participating in -- in this conference,

7    we do intend to file a written motion to stated

8    proceedings so that we may object to the ruling, seek an

9    appeal, if necessary, so that the parties not only get

10   the benefit of the bargain to arbitrate, but that we're

11   not impending upon the right of the arbitrators to

12   decide these disputes.

13           That said, in terms of the scheduling, we --

14   we would like 60 days following the Plaintiffs' motion

15   for certification to respond because we'll need to take

16   the depositions of all eight Plaintiffs who are

17   scattered all over the country.  And as a practical

18   matter, that's not something that we'll be able to

19   accomplish within less than 30 days.

20           THE COURT:  Well, I -- I don't think there's

21   any requirement that you depose all of the named

22   Plaintiffs before a certification hearing.

23           MS. DAVIDSON:  Well, Your Honor, we -- we

24   would like to get their testimony so that we can

25   determine whether we have a basis to challenge their

1   adequacy as class representatives and whether there may

2   be issues with respect to the typicality of their claims

3   compared to the claims of the class members they purport

4   to -- purport to represent.

5              THE COURT:  Yeah, I'm -- I'm familiar with

6   the process.  But in any event, that would -- there's no

7   reason you can't start scheduling their depositions now,

8   is there?

9              MS. DAVIDSON:  We can start scheduling them,

10  but we need to see what their motion --

11             THE COURT:  Sure.

12             MS. DAVIDSON:  -- says.

13             THE COURT:  Scheduling them to be done after

14  their motion is filed within 30 days, so that you can

15  accomplish the eight depositions, if you want all eight,

16  within the next 30 days after that?

17             MR. GOODMAN:  Your Honor, we obviously think

18  that -- that the time period for them to -- to respond

19  is -- is -- should be tied to the date of the filing of

20  the motion, not to some date from today.  If we get it

21  in in 18 days, they should answer on Day 48.

22             THE COURT:  Well, I -- I don't mind giving

23  them, you know, a longer period.  I -- if I thought

24  there was a serious chance you'd get your motion in

25  ahead of the deadline, then I'd spend more time on that

1   issue.  I just -- I've never seen it happen.  I know it

2   can.  I've just never seen it.  So not from you, I'm

3   not -- that's -- that's --

4              MR. GOODMAN:  Who knows, we may surprise

5   you, Your Honor.

6              THE COURT:  I look forward to it.  I hope

7   you will.

8              But in any event, my original concern, I

9   simply -- I understand that the parties want the

10   opportunity to file sort of updated responses just

11   before the hearing.  I think if you discover anything

12   about the Plaintiffs that you didn't know at the time

13   you filed your opposition, then you can include that in

14   your supplemental brief, but I don't want to delay your

15   opposition that far out.

16             So, you know, I'll give you 60 days from

17   today to file your -- your opposition to their motion.

18   We've -- I think we've cleared a date of June 4.  Both

19   sides are available that day, as I understand it.

20   Plaintiffs and --

21             MR. GOODMAN:  Your Honor, we don't have a

22   great computer calendar system right now.  I think we

23   can confirm that within a day, certainly in the morning,

24   but we're going to make time.  We're going to make it

25   happen, so -- it's hard to actually confirm it right

1   now.

2                THE COURT:  The adequacy of representation

3   issue, you know, the ability to know what your calendar

4   is, is something that you need to be ready to show the

5   Court.

6                MR. GOODMAN:  Your Honor, we had -- we had a

7   glitch.  I understand.  Thanks.

8                THE COURT:  All right.  Well, I'm -- I'm --

9   that was said in jest.

10               MR. GOODMAN:  I understand.

11               THE COURT:  And I apologize for that.

12               But UBS is available on the 4th?

13               MS. DAVIDSON:  Yes.

14               THE COURT:  All right.  Then I'll show the

15   matter as set for June 4 at 9:00 o'clock.  If you

16   discover that you have a serious conflict there, bring

17   it to my attention tomorrow and we'll try to deal with

18   it.

19               Did you discuss when you would propose to

20   exchange witness and exhibit lists before the

21   certification hearing?

22               MS. DAVIDSON:  No.

23               THE COURT:  Okay.  Frankly, that -- I

24   think --

25               MR. GOODMAN:  I might suggest the middle of

1   May for that, Your Honor.  We're going to be doing final

2   briefing presumably -- discovery before that and final

3   briefing after that for the hearing.

4                MS. DAVIDSON:  How about May 17th?

5                THE COURT:  All right.  If that's what both

6   sides want, I'll be happy to --

7                MR. GOODMAN:  Monday, Friday?

8                MS. DAVIDSON:  It's Friday.

9                MR. GOODMAN:  Okay.  That's fine.

10               THE COURT:  May 17 for witness and exhibit

11  lists.

12               Do you want to have expert reports exchanged

13  before that date in the event that you're going to have

14  experts?

15               MS. DAVIDSON:  Your Honor, we -- we'd like

16  to have 60 days following Plaintiffs' experts' reports

17  for -- for Defendants to submit its -- an expert report.

18               MR. GOODMAN:  That is not going to work

19  under any --

20               THE COURT:  Do you expect to call experts at

21  the class certification hearing?

22               MR. GOODMAN:  Your Honor, I can't -- I can't

23  say right now.  Honestly, I'm not sure we will, but I --

24  I do need some -- some time to think about that.  We can

25  certainly confer with counsel, but we will endeavor to

1    get any expert report we think we need as early as

2    possible.  But if you give them 60 days to respond,

3    we're going to be so close to the end of this 120-day

4    period, that we'd have no time to depose.

5              MS. DAVIDSON:  And, Your Honor, we would

6    request then that if -- if Plaintiffs do intend to

7    identify an expert that it be done at the same time that

8    the motion for class certification is filed.

9              THE COURT:  Do the Defendants intend to

10   call expert witnesses whether or not the Plaintiffs do,

11   but only -- or only in response to experts by the

12   Plaintiff?

13             MS. DAVIDSON:  Well, we haven't made that

14   determination yet, Your Honor.

15             THE COURT:  Well, in that case, I guess

16   what I'll do is just -- if you don't know the answer to

17   that, then my inclination would be to have simultaneous

18   expert reports exchanged.

19             If you're only going to offer them if they

20   do, then I don't mind having theirs go first, but if --

21   if -- absent that agreement, then we'll just do it

22   simultaneously.

23             MS. DAVIDSON:  Could you give us a moment to

24   confer?

25             THE COURT:  Yes.

```
 1              MR. GOODMAN:  Your Honor, we -- we -- we

 2   did confer, and it makes sense to us that we would have

 3   some period of time after their response to -- to

 4   finalize the expert reports so the expert could address

 5   any issues raised by Defendant.

 6              15 days is what we were -- what we're

 7   inclined to recommend, 15 days after the response to

 8   designate ours and maybe 30 days after that for their --

 9   them to designate theirs.

10              THE COURT:  All right.

11              MR. GOODMAN:  Certainly no longer.

12              THE COURT:  That may work.

13              Yes, ma'am?

14              MS. DAVIDSON:  Your Honor, we would propose

15   that Plaintiffs disclose any experts they -- they plan

16   to rely on at the same time as their motion for class

17   certification.  We will disclose any expert we plan to

18   rely on at the same time we file our response, and then

19   the parties can exchange rebuttal reports within 15 days

20   after.

21              THE COURT:  So are you -- when you say

22   disclose, you're talking about just identify or provide

23   a report?

24              MS. DAVIDSON:  Providing the report.

25              MR. GOODMAN:  Your Honor, we -- we can't --
```

1  we can't provide a report that addresses issues that

2  can't be anticipated that they raise.

3              MR. SHAULSON:  We didn't ask.  We said if

4  you had rebuttal, if you had -- you -- you asked that

5  you be given 15 days after our response.  We're giving

6  you the 15 days.

7              MR. GOODMAN:  And -- and your -- your -- the

8  question is --

9              THE COURT:  Do y'all want to confer again

10  or --

11              MR. GOODMAN:  Your Honor, it seems to me

12  the question is whether the rebuttal is -- is only from

13  the same designated witness or whether if there was some

14  other witness whose testimony was made relevant by their

15  opposition that we would be able to designate somebody

16  else.  That's the only procedural problem I see with --

17  with that that's obvious.

18              THE COURT:  Okay.  Well, I tell you what,

19  I'll -- I appreciate your arguments on it, and I'll

20  issue an order that sets out the expert disclosure

21  dates, along with the order that confirms the rest of

22  these dates.

23              MR. GOODMAN:  All right.  Thank you.

24              THE COURT:  All right.

25              MR. GOODMAN:  All right.  Good.  Thank you.

1           MR. SHAULSON:  Thank you, Your Honor.

2           LAW CLERK:  All rise.

3           (Recess.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATION

 2

 3          I HEREBY CERTIFY that the foregoing is a

 4  true and correct transcript from the stenographic notes

 5  of the proceedings in the above-entitled matter to the

 6  best of my ability.

 7

 8

 9
    SHELLY HOLMES                          Date
10  Deputy Official Reporter
    State of Texas No.: 7804
11  Expiration Date: 12/31/14

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```