1    IN THE UNITED STATES DISTRICT COURT
     FOR THE EASTERN DISTRICT OF TEXAS
2              MARSHALL DIVISION

3    EDDINGSTON, et al.
             Plaintiffs,        )(    Case No. 2:12-cv-00422
4                               )(    MARSHALL, TEXAS
        v.                      )(
5                               )(
     UBS FINANCIAL SERVICES, INC. )(   May 28, 2013
6            Defendants.        )(    10:00 a.m.

7

8    HENDRICKS, et al.          )(
             Plaintiffs,        )(    Case No. 2:12-cv-00606
9                               )(    MARSHALL, TEXAS
        v.                      )(
10                              )(
     UBS FINANCIAL SERVICES, INC. )(   May 28, 2013
11           Defendants.        )(    10:00 a.m.

12
                    MOTIONS HEARING
13         BEFORE THE HONORABLE ROY PAYNE
            UNITED STATES MAGISTRATE JUDGE

14

15   APPEARANCES:

16   FOR THE PLAINTIFFS:  (See sign-in sheet.)

17   FOR THE DEFENDANTS:  (See sign-in sheet.)

18   COURT REPORTER:  MS. JILL E. McFADDEN, CSR
                      Deputy Official Reporter
19                    Sunbelt Reporting & Litigation Services
                      100 E. Ferguson, Suite 900
20                    Tyler, Texas  75702
                      (903) 593-3213
21

22

23

24   (Proceedings recorded by mechanical stenography,

25   transcript produced on a CAT system.)

1                    I N D E X

2    May 28, 2013

3                                            Page

4        Appearances                          1

5        Hearing                              3

6        Court Reporter's Certificate         50

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THE COURT:  For the record, we're here for

2 the hearings in the matters of Eddingston and Hendricks

3 versus UBS which are 2:12-422 and 2:12-606 on our docket.

4    Would counsel state their appearances for

5 the record?

6    MR. ANDERSON:  Yes, Your Honor.  My name is

7 Ted Anderson and with me today is Sam Baxter.  We are here

8 on behalf of the plaintiffs in both cases.

9    THE COURT:  All right.  Thank you,

10 Mr. Anderson.

11    MR. SMITH:  And, Your Honor, for the

12 defendant UBS, Michael Smith, and from the Gibson Dunn

13 firm Mr. Paul Blankenstein --

14    MR. BLANKENSTEIN:  Good morning, Your

15 Honor.

16    THE COURT:  Good morning.

17    MR. SMITH:  -- and Mr. Eugene Scalia.

18    THE COURT:  Good morning.

19    MR. SCALIA:  Good morning, Your Honor.

20    THE COURT:  Thank you, Mr. Smith.

21    I am aware of two motions that are on our

22 agenda this morning, those being the motion to compel and

23 the motion to strike.  Are there other items that anybody

24 wants to have taken up today; if so, I'd just like to get

25 out a listing of what it is that we'll take up and then

1   we'll take things up in order.

2              Anything else for the plaintiffs?

3              MR. ANDERSON:  No, Your Honor.

4              THE COURT:  All right.  And for the

5   defense?

6              MR. SCALIA:  Your Honor, I think from our

7   perspective it would be helpful to achieve some sort of

8   understanding about how the hearing scheduled for next

9   Tuesday will be conducted.  We've had some preliminary

10  discussions with plaintiffs' counsel as to whether, for

11  example, we'd expect to have any witnesses personally

12  present, that sort of thing.

13             THE COURT:  I appreciate that, Mr. Scalia.

14  I would also like to go over that so I'll know what to

15  expect; so, after we address the motions, we'll address

16  the manner in which we'll approach the hearing, also.

17             Let me see.  I don't know if there's any

18  particular order that the parties want to proceed in, but

19  unless the parties feel differently, the motion to compel

20  was the first filed of the two and I guess I will start

21  with that.

22             MR. SCALIA:  Thank you, Your Honor.  Again,

23  Eugene Scalia representing the defendant UBS Financial

24  Services.  We've moved to compel answers in both cases to

25  interrogatories number 2, 4, 11, and 12.  And 2 and 4 sort

1 of come as a pair and then 11 and 12 as well.  Our concern

2 with 2 and 4 is those were fairly standard interrogatories

3 asking the plaintiffs to identify who had relevant facts

4 regarding the case and what those facts were, and in the

5 case of interrogatory 4, to identify the content of

6 certain conversations that occurred.  There's been some

7 supplementation over the course of our attempt to resolve

8 this without bringing this matter to Your Honor, but we're

9 still of the view that we've been given incomplete

10 information.  And so to take one example -- and I'll try

11 to put it on the screen for you.

12             THE COURT:  That would be helpful.

13             MR. SCALIA:  These are the first amended

14 interrogatory responses by Mr. Stacy.  And incidentally,

15 Your Honor, the parties reached a stipulation that in this

16 case the deposition testimony of Stacy and Eddingston

17 would be reflective of all witnesses' testimony on the

18 plaintiffs side in both cases.

19             THE COURT:  I saw that in the briefs.

20             MR. SCALIA:  So as you see here, I have

21 marked on the side.  There are several places where there

22 are just generalized statements made that there are people

23 out there, either potentially known to the plaintiff or

24 known to the plaintiffs' counsel, who could have

25 information related to the claims, but those people are

1  not identified.  And so we think it's fairly elementary

2  that its plaintiffs' obligation to provide the information

3  with -- in their own knowledge or that's possessed by

4  their lawyers that relates to the claims.  And again, I've

5  identified three different places there.

6            With respect to interrogatory 4 --

7  interrogatory 3, it asked about conversations that they

8  had had.  On interrogatory 4 was a follow-up to that

9  asking for the content of those conversations, what they

10  said, what the other person said.  They acknowledged in

11  response to interrogatory number 3 having discussions

12  with -- among fellow plaintiffs, but in 4 they don't tell

13  us what was said.  There's no privilege objection raised

14  or anything of that nature.  They just don't give the

15  information.  So, those are 2 and 4, Your Honor.

16            THE COURT:  I was under the impression from

17  your brief that 4 asked the plaintiffs to identify each

18  person from UBS who either individually or as part of a

19  group communicated with you.  Is that...

20            MR. SCALIA:  That's -- that's -- that's

21  correct.  That's what 4 asks.  And they acknowledge in

22  response their discussions among fellow plaintiffs.

23            THE COURT:  But you're -- you're saying

24  that 4 asks for the content of certain communications?

25            MR. SCALIA:  That's right.  4 says what the

1  individual said about the plan and what statements, if
2  any, you made during the communication.  But 4 -- their
3  answer to 4 doesn't provide that information for reasons
4  that they haven't explained.
5              THE COURT:  All right.  I guess that just
6  wasn't in the -- the part of 4 that was quoted in the
7  brief, so I --
8              MR. SCALIA:  I apologize, Your Honor.
9              THE COURT:  That's not a problem.
10             Let me ask you just for a moment to help me
11 understand how that information relates to the
12 certification issues.  Because while certainly I
13 understand that the scope of discovery itself is broad,
14 our real purpose here now is to deal with the discovery
15 that's necessary for next week's hearing, and so tie that
16 in for me, if you would.
17             MR. SCALIA:  With respect to interrogatory
18 2, we've had reason to believe that some people might even
19 try to have appear as witnesses to provide evidence by
20 declaration, would be captured by number 2, and yet
21 wouldn't be disclosed to us.  And, in fact, it turns out
22 there are two people on their witness list, Neustadt and
23 Eldermire, whom we've told them we object to precisely
24 because we didn't get their names in response to
25 interrogatories.

1          But there's more than that, Your Honor.

2   And if I could take a moment to give that context.

3          THE COURT:  All right.

4          MR. SCALIA:  We believe that their

5   testimony is relevant, among others things, as to whether

6   they viewed this PartnerPlus Plan, which they're claiming

7   they lost benefits under, whether they viewed that as a

8   retirement plan.  So statements they would have made to

9   one another would tell whether or not it's a retirement

10  plan.  Now, then the question is why does that matter.

11         And, Your Honor, if I could bring you back

12  to the hearing on the motion to compel arbitration, you

13  may remember there that the plaintiffs said we can't be

14  compelled to arbitrate because PartnerPlus is an ERISA

15  plan, and the arbitration agreement is in another

16  document, and you can't amend an ERISA plan without

17  jumping through the right hoops.  And they said UBS didn't

18  jump through those hoops, and so those arbitration

19  agreements that are outside the ERISA plan don't work.

20  That was their argument.

21         And, Your Honor, for purposes of that

22  motion, you accepted that argument and you said you might

23  be required to revisit it at a later point, but you

24  accepted the pleading, allegation, the complaint and the

25  like.

1            There's been actually, Your Honor, there
2   has been a change that we didn't discover until I guess it
3   was Sunday morning in deposition the plaintiffs are taking
4   in this case.  We had expected that their position would
5   be that for the same reason the arbitration agreements
6   couldn't be considered, so also the class waiver agreement
7   couldn't be considered because we thought they'd say, you
8   know, this is an ERISA plan.  There is a class waiver,
9   which we talk about in our brief, which is independent and
10  separate from the arbitration agreement.  And they said to
11  you on the motion to compel arbitration, well, the FINRA
12  rules govern arbitration here.  Of course, now we have a
13  different issue.  We're in court; we're not seeking
14  arbitration.  Instead the question is can that case
15  proceed in court as a class or did they waive that.  And
16  we think it's crystal clear that they waived it.  They
17  waived the right to proceed as a class action, and we have
18  anticipated that they, Your Honor, would present to you
19  the same argument regarding their class waiver that they
20  did regarding arbitration; namely, PartnerPlus is an ERISA
21  plan.  So we have viewed whether they themselves have
22  talked about it as an ERISA plan as, you know, very
23  important to our saying you're wrong, PartnerPlus is not
24  an ERISA plan, and therefore, those waivers are valid.
25  Whether those waivers are valid goes directly to whether

1   this class can be certified.  Because, of course, if they

2   waive the ability to proceed as a class, then there's no

3   certification.

4                The change, Your Honor, which we discovered

5   Sunday morning, is that plaintiffs aren't making the

6   argument that they persuaded you before.  Nowhere in their

7   briefs have they stepped up and said PartnerPlus is an

8   ERISA plan and, therefore, it can't be amended or in

9   conflict with another document on the ground that it's an

10  ERISA plan.  They haven't made that argument at all.

11  They're not defending the position they put forward to you

12  before, instead they're -- they've waived that issue, as

13  far as we can tell, and are no longer trying to argue at

14  this stage the class shouldn't be certified because

15  PartnerPlus, supposedly being an ERISA plan, would stand

16  in the way of -- of the class waiver agreements.

17               THE COURT:  Now, are you suggesting that

18  they will tell me in a moment that they no longer contend

19  this is an ERISA plan?

20               MR. SCALIA:  I'm not --

21               THE COURT:  Because I can find out the

22  answer to that very quickly.

23               MR. SCALIA:  I'm not that optimistic, but

24  I -- here's what I think they can't tell you.  I don't

25  think they can tell you that in either of the two briefs

1   they've filed they've said the class waiver is invalid

2   because PartnerPlus is ERISA plan.  In fact, they've said

3   the opposite.  They've said you shouldn't address that

4   question at this stage, and they have not raised that

5   defense to the enforceability of their waiver.  Instead

6   they've made only one argument, which is that the

7   compensation plan which embodies the class waiver

8   agreement, they've said, oh, that's a summary brochure.

9   It doesn't really do anything.  And in any event, it's

10  intention with PartnerPlus.

11              THE COURT:  Take me back to how this

12  relates to whether this discovery is aimed at

13  certification issues or not.

14              MR. SCALIA:  They've moved to compel class

15  certification, and we've said it's improper, among other

16  reasons, because you waived the ability to proceed as a

17  class.  I don't think they'll disagree whether they waived

18  to proceed as a class is fundamental to addressing the

19  question of whether they can get that class certified.

20              In the past, they've said as well that that

21  waiver is ineffectual because this is an ERISA plan.  They

22  haven't said we're dropping our ERISA count, but they've

23  said purely for purposes of the waiver it -- the

24  arbitration agreement itself, what they told you was we

25  can't be forced to arbitrate.  Because this is an ERISA

1  plan, you can't amend it.  Now they're not making that

2  argument.  The argument on which they won the motion to

3  compel arbitration they're not making.  So, very long way

4  of saying, Your Honor, we admit the ground has changed a

5  little bit from when we filed our motion to compel.

6              We still think this information is

7  relevant, although we do acknowledge that as relates to

8  this discovery they have not presented in their papers the

9  what I'll call ERISA defense to the enforceability of

10  their class waiver.  Now, they may stand up and say we

11  agree with Mr. Scalia.  I would expect they will because

12  their papers pretty clearly don't present that argument.

13              Regardless of what they, our position to

14  you next week will be they waived it.  And they have only

15  one objection to our class waiver.  But, you know, whether

16  they'll disagree they waived or not we'll see in a moment.

17              THE COURT:  And -- all right.  Given that

18  waiver is an issue for certification, if we go there, how

19  do these interrogatories tie back into whether they've

20  waived?

21              MR. SCALIA:  If they're going to make their

22  ERISA defense to the enforceability of that waiver,

23  they're going to say, well, that waiver doesn't work

24  because PartnerPlus was an ERISA plan, and you can't amend

25  ERISA plan without jumping through the right hoops.  If

1  they're going to make that argument, we have two

2  responses, Your Honor.  First, you waived it.  And I've

3  already talked about that.  But our second is it is an

4  ERISA -- I'm sorry -- it's not an ERISA plan anyway, and

5  the manner in which the plaintiffs have spoken among

6  themselves about it is relevant, we think, to establishing

7  whether or not it's an ERISA plan.  And then, of course,

8  on interrogatory 2 I already mentioned they are particular

9  people they've even put on their witness list.

10            THE COURT:  Well, are you suggesting that

11 if the plaintiffs among themselves have said, gosh, I

12 don't think this is an ERISA plan, that that would matter?

13            MR. SCALIA:  I -- I think it would, Your

14 Honor.  We think this plan very clearly is for purposes of

15 motivating and retaining current employees.  The vast

16 majority of money paid out under this plan is to current

17 employees.  Very little is paid out to people who are over

18 retirement age.

19            THE COURT:  And I understand that has to do

20 with your issue about whether this is designed for

21 retirement or designed for retention.  That doesn't have

22 anything to do with whether the plaintiffs have talked

23 about the plan being covered by ERISA.  I mean, most

24 lawyers could not have a meaningful discussion of whether

25 this plan is covered by ERISA let alone non-lawyers.  I

1 don't follow you why it would matter whether they thought
2 it was or didn't. I mean, surely you're not suggesting
3 that they can get up and testify that, no, we don't think
4 it's covered by ERISA and that I'll -- I'll be expected to
5 put some weight on that.
6 MR. SCALIA: I don't think they're likely
7 to have used that word. But retirement money, deferred
8 compensation, I think it's highly likely that this plan
9 was spoken about as a form of deferred compensation among
10 the plaintiffs and the people who worked at UBS, not as a
11 retirement plan. In fact, you know, they've, with their
12 papers, sought to put in evidence that they spoke among
13 themselves about how it was for retirement. That evidence
14 is pretty weak.
15 Your Honor, I think it helps as well to
16 turn to interrogatories 11 and 12.
17 THE COURT: Okay.
18 MR. SCALIA: Those are in a way related
19 again to whether this is a deferred compensation plan or
20 whether it's a retirement plan, but it also relates to
21 damages issues. The way things work in this industry is
22 if you have deferred compensation and you will lose it by
23 going to a competitor because of a non-competition
24 agreement, you're highly likely to get made whole by your
25 new employer. You'll say to the new employer, Here's the

1 deferred comp that I will lose if I come to you because

2 I've got a non-competition agreement, and that new

3 employer will say, Well, we'll give you a forgivable loan.

4          So, for example -- and I'm not going to use

5 names because some material is under seal, but one of the

6 plaintiffs left about $300,000 on the table in deferred

7 compensation but got a forgivable loan of $1.6 million.

8 That was to make that person whole for deferred comp and

9 that whole constellation, that -- that transaction

10 reflects that UBS has this plan to keep people and its

11 competitors have alternative compensation strategies to

12 lure them away nonetheless.  That is part of how business

13 is done in this industry.  And interrogatories 11 and 12

14 go to showing that it was as a form of deferred

15 compensation that this was viewed and treated not as

16 retirement money.

17          Finally, on 11 -- 11 and 12, it's relevant

18 as well to damages.  Just, for example, on the state law

19 claim, obviously they had a duty to mitigate damages.

20 They did.  They got -- one of them got $2.8 million as a

21 forgivable loan, signing bonus.  We finally learned that

22 after pressing hard on these interrogatory responses.

23 That person didn't have more than I think it was $800,000

24 in deferred compensation that he might have lost at UBS.

25          So, they had a duty to mitigate damages,

1 and we think that evidence shows that they did and then

2 some. And to the extent they didn't, well, that just goes

3 to commonality and it goes to how the individualized

4 nature of this case is going to end up dominating over

5 common issues. So that's the other reason that 11 and 12

6 are important to us on the damages front.

7                THE COURT: Well, what is there that you

8 can't present at the certification hearing without getting

9 that discovery? It sounds to me like you are articulating

10 your -- your argument fully as far as how Rule 23 will

11 treat this situation of whether or not it affects

12 commonality without getting discovery from all of their

13 current or subsequent employers.

14                MR. SCALIA: Fair question. One concern we

15 have is with the two witnesses that I mentioned, Eldermire

16 and Neustadt. If we were to have a hearing Tuesday with

17 live witnesses and those folks would show up, we have an

18 objection to that -- we've expressed it to them -- because

19 they weren't previously identified in response to 2.

20                One other concrete example, Your Honor,

21 Mr. Hendricks hasn't provided us any information regarding

22 numbers 11 or 12. We have reason to believe that he also

23 is likely to have gotten a very large signing bonus or

24 forgivable loan. He's the lead plaintiff in one of the

25 two cases, but we haven't been given the information on

1  him.  There's information we haven't gotten under 11 and

2  12 to date, but -- but I would call that out as an

3  example.

4              What -- let me confess the following.

5  First of all, I think it's well within their means to give

6  us this information this week; but secondly, if it

7  weren't, we're still prepared to go forward in response to

8  that question you posed, Your Honor.

9              THE COURT:  All right.  The discovery is

10  certainly quite a lot broader than just this issue about

11  whether they received a signing bonus.  You've asked for a

12  lot more information than just that from -- about their

13  subsequent employers.

14              MR. SCALIA:  We have, Your Honor.  We think

15  that there are, potentially, mechanisms other than simply

16  a signing bonus by which they would have been made whole

17  for the money that was, you know, supposedly left on the

18  table at UBS.

19              THE COURT:  You know, I can see, even

20  without hearing any argument about it, that there are, I'm

21  sure, going to be issues about whether or not any signing

22  bonus they may have gotten is something that UBS could

23  properly take a credit for against any liability that it

24  might have regarding the deferred compensation.  And

25  obviously, there would be questions that seem apparent

1   about what -- what the intent was of that signing bonus,

2   whether that was simply to lure the employee or whether it

3   was actually formally designated as some kind of offset

4   for whatever they left behind.

5           But do you have authority for the

6   proposition that in a case like this that signing bonus

7   would be something that would be deemed to mitigate their

8   damages?

9           MR. SCALIA:  I believe that in our

10  supplemental brief we cited case law regarding mitigation

11  generally.  Your Honor, in my mind, there's no doubt that

12  if I'm claiming I was harmed because I refused to sign a

13  non-compete and lost some money, but then the place that I

14  went to work instead gave me money that either directly or

15  indirectly was intended to mitigate the loss that I'd

16  suffered, to me it's self-evident that that's mitigating

17  money that's received.

18          Now, as to whether they'll say, "Well, no,

19  it was done for a different purpose," one of our experts

20  says, "No.  In fact, the way things work in this industry

21  is indeed that you need to offer substantial deferred comp

22  to keep people, to retain them precisely because your

23  competitors are going to be out there in the field

24  offering signing bonuses and the like."  So that's a

25  dynamic that exists in the industry.  But I think it's

1  fairly well indisputable -- our expert testified to it, I

2  believe, but I'll confess I'm not certain -- that at least

3  one of the plaintiffs in deposition acknowledged that what

4  he was owed by UBS was a factor in determining the

5  signing bonus.  If I'm wrong about that, I'll correct it

6  when I stand up again, Your Honor.

7          THE COURT:  Why isn't what a subsequent

8  employer gives a collateral source to you, why -- why

9  would UBS be able to take credit for that if they are

10 otherwise legally liable to the plaintiffs?

11         MR. SCALIA:  We wouldn't claim it as a

12 collateral source but rather that the plaintiffs, you

13 know, as in any, you know, contract-type dispute, or tort

14 dispute for that matter, have a duty to mitigate damages.

15 And to the extent that they were indeed able to go to new

16 employers and persuade them that they needed additional

17 compensation up front in order to make them whole, then

18 that reduces their injury.

19         And the Supreme Court just last month in

20 the Comcast case was, you know, very clear that if there

21 are individualized questions of damages, that can prevent

22 class certification.  And so again, to the extent the

23 plaintiffs want to say, "Oh, no.  I received a substantial

24 signing bonus because, you know, I have family illness" or

25 something like that, we're confident that is not going to

1  be the case for other class members.  And so you have a

2  destruction of common -- commonality; and for 23 --

3  23(b)(3) purposes you have a predominance problem.

4          Your Honor, to come back to the question

5  you posed, if the plaintiffs were going to say, "We're

6  putting on no plaintiff testimony we're putting on no

7  testimony by other third parties to the effect that we

8  viewed this as a retirement plan," then again, I'd concede

9  that this discovery we're arguing about right here on this

10 particular motion does become less important to us than it

11 otherwise would be.

12         THE COURT:  Well, it's -- I'm still back on

13 this issue about the relevance of the -- of the subsequent

14 employment because it's not at all apparent to me that

15 this is like a claim for lost wages where if they receive

16 subsequent wages, that that would obviously reduce their

17 claim for lost wages.  And I -- I don't doubt that you've

18 got authority for the proposition, which is obviously

19 true, that every plaintiff has a duty to mitigate their

20 damages.  But what I'm wondering is whether you've got

21 authority that you can site for the proposition that these

22 payments from a subsequent employer do reduce the

23 obligation owed by someone in the position at UBS.

24         MR. SCALIA:  With respect to the state

25 claim, Your Honor --

1     THE COURT:  Okay.

2         MR. SCALIA:  -- plaintiffs will only reach

3   that if they first establish that these are not retirement

4   benefits at issue; instead, if they've lost on that ground

5   and they're now arguing this was compensation.

6         You referred to lost wages, Your Honor.

7   I'm not aware of any legal principle that would say that

8   if there's bonus compensation or other incentive

9   compensation, there can't be mitigation if that's lost,

10  but there is mitigation that's lost wages.  You have to

11  mitigate lost wages as you've noted, Your Honor.  I don't

12  believe they can give any basis in the law why it would be

13  any different to other forms of compensation apart from

14  wages.

15        THE COURT:  Well, I think their contention

16  is that they've already earned this compensation that

17  they're seeking from UBS.  Wouldn't you agree that that's

18  their contention?

19        MR. SCALIA:  Yes, that's their -- their

20  contention, Your Honor.

21        THE COURT:  So how would anything they do

22  subsequent to their employment affect that claim?

23        MR. SCALIA:  Because if there's a practice

24  in the industry of people who have been able -- who have

25  not been paid certain wages which they've earned, being

1 able nonetheless to mitigate that through payment by a

2 subsequent employer, then I think again you have a clear

3 mitigation circumstance. Remember, Your Honor, this is a

4 dynamic circumstance where these people are being

5 recruited away from UBS. The reason that this money is

6 being lost to them in some circumstances is precisely

7 because somebody came to them and said, "I have a better

8 deal to offer you."

9 And that person -- you know, these are very

10 sophisticated people. I've told you about the kinds of

11 money that some of them are making, never mind the kinds

12 of money they're advising people on. They're making an

13 economic calculus. They're not leaving UBS to make less

14 money. What they're recognizing is they're going to make

15 more that more than makes up for what they'll lose under

16 the compensation plan; so, it's a classic case of their

17 making an economically rational decision that also

18 mitigates the loss that they would have as to the deferred

19 compensation.

20 THE COURT: Well, as to whether or not

21 you've got any authority from a court in another case

22 saying that because the former employee went out and

23 received a signing bonus or some other form of

24 compensation, they're not entitled to the deferred

25 compensation they're seeking, I take it you don't?

1          MR. SCALIA:  Your Honor, I don't have what

2    I can cite to at this moment.  I certainly will review our

3    papers, which are already before you, to see if we give it

4    to you there and be prepared to address it again next --

5    next Tuesday.

6          THE COURT:  It's certainly not in the

7    motion to compel papers, and I have not studied the

8    certification briefing yet.  Are you suggesting it may be

9    there?

10          MR. SCALIA:  It may be; I'm not sure.  And

11   I've gingerly been attempting to look at my brief while

12   speaking with you, Your Honor, which is always something

13   to be done advisedly, and that may be the reason I haven't

14   been successful in finding that case for you, but --

15          THE COURT:  Well, I'll give you the chance

16   to do that in a moment while I'm talking to plaintiffs'

17   counsel.  But I guess my -- my primary concern with your

18   motion to compel is trying to figure out what you really

19   need in the way of further answers to these

20   interrogatories in order to properly present what you need

21   for next week.  Because I'll just say, I do anticipate

22   giving the plaintiffs as well as the defendant the

23   opportunity to call live witnesses, so that -- that's

24   something that you should know is -- is possible.  I'm not

25   going to order them to, but, I mean, that's one of the

1  reasons we set the hearing is so that they can.

2        So, if you can identify for me what further

3  responses you think you need in order to be prepared for

4  that, I'll focus on those with the plaintiff.

5        MR. SCALIA:  Your Honor, I think that one

6  is the information regarding Mr. Hendricks compensation

7  when he went to his new employer, which I think was Wells

8  Fargo.  That hasn't been provided to us.  Three of the six

9  did receive very substantial forgivable loans.  We don't

10 know about Hendricks.

11       And then with respect to unidentified

12 witnesses, what I would say is that our principle concern

13 at this point is that two people are put on the witness

14 list who were plainly responsive to interrogatory number

15 2.  For that reason we've told the plaintiffs that we

16 object to their being called as witnesses since they were

17 identified at such a late date to us.

18       THE COURT:  And give me their names one

19 more time.

20       MR. SCALIA:  Neustadt and Eldermire.

21       THE COURT:  Okay.

22       MR. SCALIA:  And if I could add a third

23 thing, Your Honor.  If indeed it is the plaintiffs' intent

24 to take the stand next week and testify to conversations

25 they supposedly had about how they regard this as a

1  requirement benefit, and we do think it's highly improper
2  that they refuse to answer this interrogatory number 4 or
3  for that matter, decline to respond to 11 and 12, which
4  again we think is information that shows not just
5  mitigation but we also think it's relevant to showing that
6  in a sort of vernacular the financial advisor's business,
7  these compensation plans are, in fact, reviewed as --
8  viewed as deferred comp, something that's a present
9  expectancy rather than retirement money, and that's why
10  it's a subject of negotiation when people are looking to
11  go from one firm to another.
12              THE COURT:  Okay.  Thank you, Mr. Scalia.
13              MR. SCALIA:  Thank you, Your Honor.
14              MR. ANDERSON:  Your Honor, Ted Anderson on
15  behalf of the plaintiffs.  In response to the motion to
16  compel that has been filed and argued by the defendants in
17  the case, I'd like to just point out -- make a couple of
18  points here with regard to some of the argument that I've
19  heard.  With regard to the statement that they have never
20  heard of Mr. Eldermire and Mr. Neustadt, looking at the
21  plaintiff Bill Hendricks' first amended answers to first
22  and second interrogatories and the response to -- let's
23  see here -- No. 10 that I'll put up on the screen -- I'm
24  sorry.  I'm a page short -- we do disclose Mr. Neustadt
25  and Mr. Eldermire.

1        But I think it -- the real point is how is
2    any of this relevant or even discoverable under the
3    circumstances.  We bent over backwards to try to give the
4    defendants information that they've requested, but
5    frankly, it appears to us that this is a classic textbook
6    case for class certification, Your Honor, and the
7    defendants have been reduced to efforts to try to create
8    new law in order to create certification -- issues on
9    certification in order to avoid it.  And primary among all
10   of that is their attempt to inject merits issues on
11   whether or not the ERISA plan -- whether the PartnerPlus
12   Plan is an ERISA plan, and so most of the discovery that
13   they are seeking here goes to that issue.
14        With regard to this issue of whether or not
15   there is mitigation involved, our claim is that there was
16   a forfeiture.  And our claim is not that there is some
17   lost future wages that mitigation would be applied
18   against.  As the Court undoubtedly knows, when you are
19   looking at an employment case, the duty to mitigate
20   applies against future wages.
21        And so, for example, if employee A was
22   terminated on January 1, he has a duty to go out and get
23   another job and generate wages, and those new wages would
24   be applied against the future wages that that employee
25   would -- damages claim the employee would have under the

1   circumstances.  That is not the issue here.  Here we're
2   talking about a forfeiture, here we're talking about wages
3   that were already earned under the circumstances, and this
4   is just a red herring that they're throwing in the -- into
5   the proceeding to try to confuse the issues.
6            In addition, with regard to this argument
7   that they have received some kind of a bonus, there's no
8   evidence that any of the plaintiffs received a bonus.
9   What they get is a loan for a certain amount, and the loan
10  is tied to the book of business that the employee can
11  allegedly generate when they go to the new -- to the new
12  job.  It doesn't have anything to do with the forfeiture
13  under the circumstances; so, there's just no relevance to
14  any of the discovery that they're requesting here under
15  the circumstances.  And so we have amended a number of
16  times to try to meet their complaints, but it just -- it
17  just seems like we're drilling down on -- on merits issues
18  that are outside the scope of class action discovery.
19           THE COURT:  And tell me for what purpose
20  you would expect to call Mr. Neustadt and Mr. Eldermire.
21           MR. ANDERSON:  It would probably be -- it
22  depends upon the issues that are raised really by the
23  defendants, Your Honor.  The -- the problem that I have
24  and we're -- and I hope that we get to this in my motion
25  to strike their expert -- is they have decided that

1  they're going to go and try to -- to litigate the merits
2  of whether or not the PartnerPlus Plan is an ERISA plan at
3  the class certification stage.  And so if that is -- if
4  that is the issue and they are trying to somehow or other
5  make an argument that there was no time ever that it was
6  ever communicated to the class that the PartnerPlus Plan
7  was a plan that was designed for retirement, then it would
8  be rebuttal for that under the circumstances.

9              And it's -- and as you see from the
10 declarations that we've added to our motion for class
11 certification are -- plaintiffs address that issue as
12 well.  But the problem is this is the class certification
13 stage; this isn't the merit stage.  And I just -- you
14 know, they have made the same objection in discovery
15 requests that we've made, and so as they continue to kind
16 of move down this path to try to inject merits issues into
17 the class certification, you know, we're -- we're amassing
18 the evidence that we may have to rebut it.  But I have to
19 be candid with the Court.  If -- if this is going to be a
20 merits issue, we're going to need six months of discovery
21 because the issue of whether or not the PartnerPlus Plan
22 is a retirement plan under ERISA, you have to look -- you
23 have to litigate the facts and circumstances surrounding
24 the operation of that plan.  And that is going to entail
25 dozens of depositions, hundreds of thousands of pages of

1  documents, and I just don't think that this is the

2  appropriate time to litigate that, Your Honor.

3          THE COURT:  All right.  The -- one of the

4  categories that Mr. Scalia talked about needing was

5  information about conversations that you might provide

6  testimony about.  You heard that portion of his argument,

7  I'm sure.  Do you intend to offer such testimony at the

8  hearing?

9          MR. ANDERSON:  Only if it's -- if it's in

10  rebuttal to points that are made by the defendants in the

11  case, Your Honor.  At this point, we don't anticipate

12  calling any witnesses at the class cert hearing.  We would

13  just offer the declarations that we have and the

14  deposition testimony that's available to all the parties;

15  but otherwise at this point, we don't intend to call any

16  of them live.

17          But, you know, they've got these experts

18  that are -- that are going to testify on the merits of

19  whether or not the PartnerPlus Plan is an ERISA plan, and

20  that is a big, big issue.  That's what this case is all

21  about.  And they're trying to get to the ultimate issue

22  basically after giving us two weeks' worth of documents in

23  the case, and so we're -- we're trying to, you know,

24  maintain our options under the circumstances, but I think

25  that this case could -- I think class cert can be decided

1  on the declarations and the deposition testimony that's

2  already been taken.

3          THE COURT:  All right.  Well, thank you,

4  then, Mr. Anderson.  And we'll take up your motion to

5  strike as soon as we finish with this motion.

6          MR. ANDERSON:  Yes, Your Honor.

7          THE COURT:  Mr. Scalia, from what I saw in

8  the record, reading the briefs on this motion and looking

9  at the various iterations that the plaintiffs have

10  provided of responses to date, I -- I am not convinced

11  that there is anything further in the discovery that you

12  need in order to be prepared for class certification.

13  I -- I understand it can be a difficult line to draw

14  between the merits and certification issues, but I have

15  not seen anything that I think is necessary for you to

16  address the Rule 23 issues that will be up for

17  consideration next week.  This is -- I'll give you the

18  last word if -- if you think there's something else that

19  would change that impression.

20          MR. SCALIA:  Briefly, Your Honor.

21  Mr. Anderson referred to UBS injecting the merits issues

22  and suggested the merits issues can never be addressed at

23  the class certification stage.  Obviously, that latter

24  proposition is simply wrong.  The Supreme Court has now

25  been clear time and again that when certification issues

1   are intertwined with merits issues, the Court can and
2   indeed must get to the merits questions.
3               Now, with respect to his saying that UBS
4   has interjected the merits question of whether this is an
5   ERISA plan into the case at this stage, it's actually the
6   plaintiffs, Your Honor, who, in avoiding arbitration,
7   insisted that the Court reach a decision and rule that
8   PartnerPlus was an ERISA plan.  Now, they -- as I
9   mentioned before, they seem to have waived that position
10  for purposes of this new issue on the class waiver.  I
11  didn't hear anything to the contrary now, but the fact
12  remains it was plaintiffs.
13              MR. ANDERSON:  Judge, for the record, I --
14  I do dispute that allegation.  I just want to make sure
15  that's of record, and I'm sorry to interrupt.
16              THE COURT:  All right.  The record will
17  reflect your position.
18              But go ahead.
19              MR. SCALIA:  Which reflects as well, Your
20  Honor, that it's not defendants who have put that issue
21  in; it's plaintiffs who are trying to put it in.  Now they
22  didn't raise it in their briefs.  It's not there anywhere
23  that this class waiver is unenforceable because
24  PartnerPlus is an ERISA.  They have clearly waived that.
25  That will be our position a week from now.  But they're

1  not willing to concede right now that they're not putting

2  the ARISA'ness of this plan forward, so they're just not

3  in a position to tell you that evidence regarding whether

4  or not it's an ERISA plan is irrelevant.  If they're going

5  to try to resist the class waiver on the ground that

6  PartnerPlus is an ERISA plan, then we're back to talking

7  about whether it's an ERISA plan, but the Court won't be

8  able to simply go on the allegations of the complaint as

9  -- as the Court did before.

10             They propounded extensive discovery on UBS.

11  Thousands of documents have been produced.  They took the

12  deposition of a very senior executive at UBS regarding the

13  purported retirement futures of the plan; so, that's been

14  two ways.  Again, I've been clear enough that we view it

15  as waived and we'll take that position, but, at the same

16  time, we obviously need to protect ourselves by being

17  prepared to put evidence in.

18             There was a reference by Mr. Anderson to

19  submitting deposition testimony.  We don't believe they've

20  identified any deposition excerpts for use at the hearing;

21  so, I'm not sure what he was referring to.  But, you know,

22  obviously to the extent that they intend to do that, we

23  need advance notice and some ability to respond to that as

24  well.

25             THE COURT:  All right.  Well, at this time

1  I'm going to deny the motion to compel.  I'm not ruling

2  that you're not entitled to further discovery as the case

3  progresses, but I'm going to deny the motion with respect

4  to the upcoming hearing.  So, thank you.

5          And I will -- I will just say for the

6  record that I am not at all disputing that there are

7  merits issues that have to be considered within the

8  context of this class certification issue.  The question

9  where I may differ from you is to whether the merits

10  issues should be decided at this point.  The fact that

11  they're in the case is something that relates to the way

12  Rule 23 applies to this case and whether Rule -- whether a

13  class action is manageable, superior and otherwise

14  appropriate device.

15          But determining those merits issues at this

16  stage I think is not appropriate, and that's -- that may

17  be where you and I would depart.  But in any event, you'll

18  have an opportunity, as will the plaintiffs, to put all of

19  those positions out and -- and then we'll take up

20  certification in light of that.

21          Anyway, thank you, Mr. Scalia.

22          MR. SCALIA:  Thank you, Your Honor.

23          THE COURT:  Mr. Anderson, let's turn to

24  your motion to strike.

25          MR. ANDERSON:  Yes, sir.

1            THE COURT:  And I will say I've read the

2    briefs on that and I have some initial impressions that I

3    want to provide you so that you can clarify for me what

4    your position is on them.  The first thing is it's -- it

5    is my understanding from the motion that the expert

6    designations by the defense were made on a timely basis

7    under the docket control order issued in February and that

8    the issue is whether or not the supporting documents or

9    underlying documents relied upon by those experts were

10   timely disclosed.

11           And is that correct, you're not contending

12   you didn't get the expert reports themselves on time?

13           MR. ANDERSON:  That is -- yes, Your Honor,

14   that -- that is correct.  We did receive the report in a

15   timely fashion -- the reports in a timely fashion.

16           THE COURT:  And I'm sure, obviously, you

17   saw the law that they cited in their opposition brief to

18   the effect that there is no requirement that the documents

19   relied upon by the expert actually be produced at the same

20   time as the report.  How do you respond to that?

21           MR. ANDERSON:  Well, Judge, they -- the

22   defendants have an ongoing obligation to produce relevant

23   documentation at all times.  And to the extent that -- and

24   typically what happens when we file expert reports is all

25   of the information that the expert report is based upon is

1 evidence that has already been -- or discovery that has

2 been fully disclosed and vetted, so there's no surprise as

3 to new documentation.  Or under the circumstances here,

4 the first time that we saw -- well, here, the information

5 that their accounting expert has based her opinion upon is

6 information that came from Deloitte and another consulting

7 firm, and none of that information had been produced in --

8 in general class action discovery in this case.  And --

9      THE COURT:  Well, have there been initial

10 disclosures in this case?  I -- it's not my impression

11 that -- that we have kicked off this case as we would an

12 individual action by requiring initial disclosures and

13 opening discovery.

14      MR. ANDERSON:  We have not, Judge.  But we

15 have not had general -- we haven't made requests for

16 disclosures, and we haven't had general merits discovery

17 in the case.

18      THE COURT:  So where is this obligation

19 you're referring to coming from?

20      MR. ANDERSON:  Well, in my opinion, it

21 comes from our document request that we served upon them.

22 And I'll -- let me pull this out for you.  Let's see.

23      Okay.  Your Honor, the -- the plaintiffs

24 made a discovery request in this case.  It's Plaintiffs'

25 First Request for Production of Documents to Defendant UBS

1  Financial Services.  And we received --

2                THE COURT:  When did you propound that?

3                MR. ANDERSON:  It was prior to the expert

4  report.  And -- and what I have in front of me, Your

5  Honor, is their response which is dated March 19, 2013.

6  So this is -- it was before March 19th, 2013, and I have

7  their response from March 19, 2 -- 2013.

8                And in our request, we requested a number

9  of things, Your Honor.  1 is, "All documents evidencing

10 the amounts of any forfeitures referred to in request for

11 production number 1."  Okay?

12               Now, clearly, the information that their

13 accountant has relied upon is documentation that refers to

14 forfeitures, because her opinion is basically that the --

15 the amount forfeited is something that is -- is tracked

16 with Deloitte and with this other consulting firm, and

17 that information was what she relied upon in giving her

18 opinions.

19               And the response is, "Since discovery at

20 this time is, by Court order, limited to issues pertaining

21 to plaintiffs' pending motion for class certification,

22 defendant objects to the request as unnecessarily

23 burdensome.  As the amount of forfeitures is not relevant,

24 it would not lead to the discovery of information that

25 would be relevant to any issue under Federal Rules of

1  Civil Procedure 23."

2          If you then go to our request number 5, we

3  say, "All documents relating to any contention by

4  defendant that the PartnerPlus Plan for financial advisors

5  is not subject to the Employee Retirement Income Security

6  Act or to its minimum vesting, anti-forfeiture and

7  separate funding provisions." Which is the exact opinion

8  that both of their experts have opined upon.

9          And their response is, "Defendant objects

10 to the request for production number 5 on the grounds that

11 it's premature as such contention discovery is

12 inappropriate at this early stage of discovery."

13         So, they are telling us that that evidence,

14 those -- that discovery -- the very discovery on which

15 these expert opinions are based is not relevant, and they

16 withheld the documents under that objection. They go on

17 to say, "Defendant further objects to the request to the

18 extent it seeks information or communications protected by

19 attorney -- the attorney/client work product privilege."

20 And we have yet to receive the privilege.

21         So, that is the -- that was the pending

22 requests that we had to them. They are making objections,

23 basically, that the contention as to whether or not the

24 PartnerPlus Plan is an ERISA plan is not relevant at this

25 early stage, and then on the date of filing expert

1  opinions, they spring upon us these two experts that give

2  the very opinion that the ERISA plan -- that the

3  PartnerPlus Plan is not an ERISA plan based upon documents

4  that they never produced to us.  And so they can't have it

5  both ways, Your Honor.  Either we're going to get into the

6  merits of discovery, and if we are, we're going to have to

7  get -- we're going to need an extension of time to get,

8  you know, appropriate discovery so that we can meet the

9  opinions that are being offered; or, they can stand on the

10  objections they made here, but they can't have it both

11  ways.

12            THE COURT:  All right.  Let me hear from

13  Mr. Scalia in response to your argument.

14            MR. SCALIA:  Your Honor, your initial

15  questions regarding the timeliness of the reports and --

16  regarding the reports compliance with the Rule 26 expert

17  requirements, with all respect, I think those are the

18  dispositive questions here.  We complied with our

19  obligations under the order that plaintiffs decided not to

20  move forward with experts.  They're obviously very

21  troubled by these reports.

22            Incidentally, Mr. Anderson himself brought

23  to your attention discovery they propounded seeking our

24  documents relating to the ERISA question.  And as I said,

25  we produced thousands of those.  We put a senior executive

1  in deposition so they could ask him about those documents.

2  In fact, we accelerated the production and produced

3  documents, including this underlying data, before it was

4  even due under the requests.

5  Mr. Anderson then pivoted and spoke to you

6  about two different document requests that I don't believe

7  he even raised in his motion to strike.  He suggested,

8  first of all, that this information is responsive to their

9  initial document requests and then he turned to their -- I

10  believe to their second document request.  As he noted,

11  though, we objected to their first document request.

12  However, as to questions 1 and 2, which is the ones he

13  focused on, the number of people, the amounts of

14  forfeiture, Your Honor, we gave them that information.

15  My colleague, Paul Blankenstein, who's with

16  me here sent an e-mail --

17  Paul, if you can hand it to me.

18  -- to Mr. Goodman, lead counsel for the

19  plaintiffs, giving him that information.  And I believe

20  that --

21  THE COURT:  When was that?

22  MR. SMITH:  That e-mail was April 10th.

23  THE COURT:  And was the information that

24  was provided April 10 the same information that your

25  experts relied upon in -- in their opinion?

1          MR. SMITH:  No, it wasn't, Your Honor.  But
2     it was the information that -- as we read the
3     interrogatories -- or the production requests -- had been
4     called for at that time, the number of participants, the
5     amounts of forfeiture.  The key thing is they never filed
6     a motion on their first discovery requests.  We're not
7     here today on a motion under those first discovery
8     requests.  And as to their second discovery requests, we
9     provided the data that is at issue, Your Honor, before our
10    responses were due under those second discovery requests.
11         THE COURT:  Well, let me just take up one
12    thing that appeared to me to be the case from
13    Mr. Anderson's presentation, and that is that they asked
14    in their request for production number 2, I believe, for
15    documents supporting the proposition that the plan is not
16    subject to ERISA.
17         MR. ANDERSON:  That's number -- that's
18    number 5, Your Honor, and I can give you a copy of our --
19         THE COURT:  Okay.  And your response to
20    that was that that's not an appropriate issue for this
21    stage of the case.  Is that right so far?
22         MR. SCALIA:  We raised that objection, but,
23    Your Honor, again, as I mentioned, we've submitted
24    thousands of pages of documentation due to subsequent meet
25    and confers over that request.  And -- and on April 19th,

1  Mr. Stris, one of their lawyers, wrote us about that

2  particular request.  He didn't talk about this data that

3  were at issue now.  He says the response to request for

4  production number 5 is particularly troubling.  And when

5  you look at that, what he's focused on was this is not the

6  request that ultimately is the one that focused on the

7  underlying data.  There were other requests they focused

8  in a -- that they propounded in discovery, served that

9  same day.  April 19th they served new requests.  Those new

10  requests were specific about the data.  We then provided

11  the data again on an accelerated time table.  But neither

12  this first request nor the second request was either the

13  basis for their motion.  They've now conceded our expert

14  disclosures were proper, and they've, I think, backed off

15  their claim that we had any general Rule 26 obligation to

16  update.  So what they're left to do is go back and argue

17  two different sets of discovery that they never even moved

18  on, and the second of which was intended to cure the

19  dispute over the first and resulted in their receiving

20  this data early.

21              THE COURT:  Just so I'll understand, are

22  you saying that after the response that we just saw to

23  request for production number 5 wherein you objected that

24  it was not the appropriate stage, they, on April 19,

25  submitted a -- a further perhaps more narrowed request for

1  that information which you then responded to?

2              MR. SCALIA:  That's exactly what happened,

3  Your Honor.  We provided our responses and objections, and

4  this issue was quiet for a long period of time.  Then on

5  April 19th, we received simultaneously a letter, which

6  Mr. Anderson referred to, and also new and far more

7  specific requests.  So, just to read some of them, request

8  number 1:  "All documents relating to the identity of each

9  participant.  Number 2" --

10             THE COURT:  Well, you don't need to read

11  that now.

12             MR. SCALIA:  Okay.

13             THE COURT:  Let me just ask Mr. Anderson.

14             Is it true that on April 19 you submitted a

15  refined document request in the same vein as the requests

16  that you showed me that were responded to on March 19?

17             MR. ANDERSON:  Judge, we did in an effort

18  to resolve their objection narrowed the requests that we

19  made for information, but it was based upon their

20  objection that it was premature.  So we didn't -- we

21  didn't give up on that.  All we did is we say, well, for

22  the time being, give us these documents that are

23  responsive under the circumstances, but they still never

24  produced any of the documents that their experts relied

25  upon at any time until days, if not a week, after they

1  actually filed the reports.

2          THE COURT:  It's my understanding that they

3  produced them on or about May 18; is that right?

4          MR. ANDERSON:  That -- so far as my

5  recollection is concerned, Your Honor, if that's five or

6  six days after the report was submitted, that is correct,

7  Your Honor.

8          THE COURT:  And that would be about 30 days

9  after your -- your April 19 narrowed requests?

10          MR. ANDERSON:  Yes, Your Honor.

11          THE COURT:  So I...  Under the

12  circumstances, I don't see that history as providing a

13  basis to strike those expert reports.  I have not had an

14  opportunity to determine the effect of those reports, and

15  I'll keep in mind this -- this record as I'm determining

16  that.  And if there's some basis to provide relief,

17  I'll -- I'll reconsider it at that time.  But at this

18  time, I'm going to deny the motion to strike the

19  defendant's expert reports.

20          And, Mr. Anderson, if you've got something.

21          MR. ANDERSON:  Yes, Your Honor.

22          THE COURT:  Go ahead.

23          MR. ANDERSON:  And I didn't mean to

24  interrupt.  But we also requested leave to continue --

25  partially continue the hearing on class certification so

1   that we can obtain discovery and submit a rebuttal expert

2   under the circumstances, and I wanted the Court to

3   consider that as well in its ruling.

4           THE COURT:  Given how close we are to the

5   hearing, I think what I'll do is just tell you that I'm

6   going to deny that request at this time.  But you can

7   reurge that in the form of a motion to keep the record

8   open at the close of the hearing, after I've had a chance

9   to study the expert reports and have a better

10  understanding of -- of the effect of them.

11          And, obviously, Mr. Scalia, I'm reserving

12  to you all -- whatever your objections would be to that.

13          I'm not expressing an opinion one way or

14  the other.  I'm just going to say that I don't see the

15  basis for that relief at this time, but I may understand

16  it better next week.  And you can reurge it if appropriate

17  then.

18          I think you have heard, Mr. Scalia, what

19  Mr. Anderson said about his expectations for the hearing,

20  that he was intending to proceed on the papers.  I do

21  understand there's an issue about deposition designations

22  that we'll get to.  But setting that aside for a minute,

23  if he proceeds in the way he just indicated, what is your

24  intention regarding witnesses?

25          MR. SCALIA:  We would not have witnesses

1  either.  Now, that's on the understanding, of course, that

2  the expert reports are material that would be considered

3  by the Court.  They are paper, they're before the Court,

4  and we would argue those, but we wouldn't have witnesses

5  live.

6           THE COURT:  Okay.  Let's turn back to the

7  issue of depositions.

8           Mr. Anderson, you alluded to the

9  possibility of offering depositions.  Have you made a

10  decision, and if so, I guess I -- I do think it's

11  important that you let the defendants know in advance what

12  portions of any depositions you're going to use so that

13  they can make a decision about what, if any, other

14  portions of those depositions they want to offer.

15           What do you say about that?

16           MR. ANDERSON:  Your Honor, I totally

17  understand that.  We actually refer in our supplemental

18  papers to motion for class certification.  We allude to

19  some deposition testimony.  And so I think we just need to

20  have a deadline of maybe Thursday to submit those to the

21  defendants, give them an opportunity to at least know in

22  advance what it is that we plan on submitting.

23           THE COURT:  All right.  If you make those

24  known to the defendants by close of business Thursday.

25           Mr. Scalia, could you, by some time on

 1  Monday, then respond with notice as to what portions of

 2  those depositions you wanted to offer, also?

 3              MR. SCALIA:  We could, Your Honor.  Now, I

 4  understood initially from Mr. Anderson that they were

 5  simply going to use those deposition portions which are

 6  cited in the papers.  So, if that's the case, we're good

 7  to go.  We already know what they're using.

 8              THE COURT:  All right.  Are there other

 9  portions besides those cited in your papers?

10              MR. ANDERSON:  I think so, Judge.

11              THE COURT:  Okay.

12              MR. ANDERSON:  And so we'll review it and

13  we'll give a full -- we'll set forth fully the excerpts

14  that we plan to use.  My intention was at the hearing

15  that, depending on how the arguments are going, we may

16  refer to the Court to certain deposition portions, and so

17  it's a good exercise for us to get that together in

18  advance, and we'll get that them by the close of day on

19  Thursday.

20              THE COURT:  All right.  And I understand

21  this is a tight schedule, but if we go with close of

22  business Thursday, I would need you, Mr. Scalia, to make

23  yours by, say, noon Monday so that they can have some

24  notice before the hearing starts Tuesday morning.

25              Is that workable for you?

1      MR. SCALIA:  Yes, we can make that.

2      THE COURT:  Okay.  Then we'll proceed in

3  that fashion with depositions.  And you should just

4  come -- if you haven't already tendered those in the five

5  boxes of courtesy copies that we got, come with -- with

6  copies to tender to the Court at the hearing so that we'll

7  have those then, Mr. Scalia.

8      MR. ANDERSON:  Judge, do you want us to

9  file those on Thursday?

10      THE COURT:  I -- the other exhibits that

11  you're planning to offer at the hearing, have those been

12  E-filed?

13      MR. ANDERSON:  I don't believe so.  We have

14  identified them, but we have not actually given you copies

15  of them.

16      THE COURT:  Well, then let's treat them all

17  the same way so that on Tuesday we'll have a bundle,

18  whatever size it would be, of your exhibits and we can --

19  I -- we're going to want to have those in electronic

20  format for the record, but for purposes of my use of them,

21  I'm -- I'm happy to have a paper copy.

22      MR. ANDERSON:  So we'll -- we'll submit

23  them to you on a CD as well as in paper form?

24      THE COURT:  I'm not going to try -- yes.

25  I'm not going to try and have those read before the

 1  hearing; so, you don't need to get them to me before the
 2  hearing.  I just want your adversary to have notice of
 3  that in advance, that you can bring all those exhibits
 4  with you to the hearing, and we'll put them in the record,
 5  one paper copy and an electronic disc as well.
 6              MR. ANDERSON:  Yes, sir.
 7              MR. SCALIA:  It is 180 different documents,
 8  I believe.
 9              I don't know, Mr. Anderson, if it's
10  possible to pare that down.  We can try to do the same in
11  advance of the hearing.
12              MR. ANDERSON:  Obviously, we'll try to do
13  that.
14              THE COURT:  The Court will be able to pay
15  closer attention to a smaller number of documents, so I
16  would -- I would ask that you do that to the extent
17  possible.
18              And, Mr. Scalia, do you have other
19  questions about how we're going to proceed on Tuesday?
20              MR. SCALIA:  No, Your Honor.
21              THE COURT:  Okay.
22              MR. SCALIA:  I did want to clarify one
23  thing for the record.  When I spoke earlier on the motion
24  to compel, I said that I thought a certain statement had
25  been made by Mr. Eddingston in his deposition but I wasn't

1  a hundred percent sure and I would check.  I did not have

2  that quite right and I just wanted to let you know that I

3  checked with my colleague and the statement I represented,

4  he -- it's not exactly what he said; so, I just wanted to

5  clarify that in the record since I told you I would double

6  check.

7                    THE COURT:  All right.  Well, thank you for

8  doing that.

9                    Anything else that we need to take up

10  today?

11                   MR. ANDERSON:  No, Your Honor.

12                   MR. SCALIA:  My esteemed colleague,

13  Mr. Smith, suggests that we ask you how long you expect

14  the hearing to be on next Tuesday.

15                   THE COURT:  If -- if what we're talking

16  about is putting the exhibits in and then hearing oral

17  argument, I would expect that we'll be done by noon.  That

18  would be my expectation.  We're starting at 10:00; is

19  that -- or is it at --

20                   MR. SCALIA:  9:00.

21                   THE COURT:  -- 9:00?  Well, then we should

22  be done well before then.  But that -- really, I want to

23  give you an opportunity to present your arguments in the

24  way you think is most effective; so, I'll -- I'll be at

25  your disposal in that regard.

1                    All right.  Well, thank you, and we are

2    adjourned.

3                    (Hearing adjourned.)

1          CERTIFICATION

2          I HEREBY CERTIFY that the foregoing is a true

3   and correct transcript from the stenographic notes of the

4   proceedings in the above-entitled matter to the best of my

5   ability.

6

7   _____  _____  May 31, 2013

8   JILL E. McFADDEN
    Deputy Official Reporter
    State of Texas No.:  3392
9   Expiration Date:  12/31/14

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  Job No.  110098